[L. A. No. 14798. In Bank.—April 17, 1935.]

COUNTY OF LOS ANGELES (a Body Corporate and Politic), Petitioner, v. JOHN E. ROCKHOLD, County Surveyor, etc., Respondent.

Everett W. Mattoon, County Counsel, and Harold W. Kennedy, Deputy County Counsel, for Petitioner.

Ray L. Chesebro, City Attorney of Los Angeles, Robert J. Stahl, Deputy City Attorney of Los Angeles, O'Melveny, Tuller & Myers, James L. Beebe, Clyde Woodworth, Louis H. Burke, C. L. Byers, Maurice M. Myers, City Attorney of Oceanside, C. E. Kennedy, City Attorney of Lynwood, M. Tellefson, City Attorney of Culver City, Harold P. Huls, City Attorney of Pasadena, and Boyd C. Barrington, City Attorney of Santa Monica, as *Amici Curiae* on Behalf of Petitioner.

Roscoe R. Hess for Respondent.

THE COURT.—This is a petition for a writ of mandate to compel the respondent County Surveyor of Los Angeles County to prepare a diagram and make a reassessment for the refunding of bonds of Acquisition and Improvement District No. 67 in said county. The refunding proceedings were instituted in accordance with the provisions of the "Re-

funding Special Assessment Bond Act of 1933'' (Stats. 1933, chap. 749). The purpose of the proceeding is to test the constitutionality of that statute.

A brief review of the legislative and economic background of this case is necessary to a complete understanding of the issues involved.

Improvement districts of various kinds have long been authorized by statute in this state. The earlier type provided for financing the improvement by assessments levied upon the property benefited, which assessments or bonds issued in lieu thereof became a specific lien upon the particular parcels of property, usually in odd denominations, and payable at varying dates. Of this type were the bonds provided for in the Vrooman Act of 1885, the Street Opening Act of 1903, and the Improvement Act of 1911. In 1907, a new type of financing was introduced in the ''Road District Improvement Act of 1907'' (Deering's Gen. Laws 1931, Act 3276). Under the method therein provided, the bonds were issued in even denominations, and were to be paid by annual *ad valorem* assessments levied in the district; a bond was not a specific lien against any parcel of land, but was secured by the unpaid assessments, and the general taxing power. The ''Acquisition and Improvement Act of 1925'' (Deering's Gen. Laws 1931, Act 3276A) and the ''Improvement Bond Act of 1915'' (Deering's Gen. Laws 1931, Act 8209) also employed this new type of lien. The bonds were found to be a more marketable type of security and sold at a lower interest rate than the specific lien special assessment bonds under the old acts. A large number of districts was organized and financed by this method, and a great deal of development took place. It is stated in some of the briefs filed herein that over $50,000,000 of bonds of this type are now outstanding. Many of the ventures financed in this manner were speculative in character and turned out badly; other districts were adversely affected by the general shrinkage in land values and the serious economic depression of recent years. A great many land owners have been unable to meet the annual assessments for the payment of principal and interest on the bonds and have defaulted. From 1930 to the present time delinquencies have increased until it appears that in over half the districts the delinquencies are greater than the amount paid.

In many districts, the delinquencies total over 90 per cent of the total area. This increasing default has led to the evil of "pyramiding" the tax, the district being forced to levy taxes not only for principal and interest due in the current year, but also for past due principal and interest. The result is that the land owner who is able to pay may be forced to meet the delinquencies of those who do not, or else lose his property in spite of the fact that he has paid the amount reasonably attributable to the benefits accruing to his land by the improvement. This fact has undoubtedly contributed to a general unwillingness to pay these assessments. Inasmuch as such assessments are collected as part of the county and municipal taxes, it appears that the collection of such taxes has been likewise adversely affected. Large areas of land have been sold for unpaid taxes, with the result that the burden falls unequally on the remaining properties. The duty of the county or municipality under the Acquisition and Improvement Act to pyramid the taxes was declared by this court and by the United States Supreme Court in *American Securities Co.* v. *Forward,* 220 Cal. 566 [32 Pac. (2d) 343]; *Irones* v. *American Securities Co.,* 294 U. S. 692 [55 Sup. Ct. 403, 79 L. Ed. 1232].

Viewing this uncertainty as the principal cause of distress, an attempt was made to refund the obligations of these districts by eliminating the *ad valorem* method of bond payment, and substituting for it the old system of a specific assessment upon each parcel of land in accordance with the benefits actually received. The owner, by paying that assessment in cash, or paying off the particular bond issued against his land within the period specified, would satisfy his obligation in full, and would not be subject to any tax or assessment by reason of delinquencies of others in the district. The evils incident to pyramiding would thus be done away with. This plan was embodied in the "Refunding and Reassessment Act of 1931" (Deering's Gen. Laws 1931, Act 3276C). The statute came before this court in the case of *County of San Diego* v. *Childs,* 217 Cal. 109 [17 Pac. (2d) 734], and we held it unconstitutional on the ground that it impaired the contract rights of the land owner, by subjecting him to certain burdens not imposed upon him at the time the original bonds were issued.

The legislature then enacted the present statute, the "Refunding Special Assessment Bond Act of 1933", which has

the same general object, namely, to substitute specific lien bonds for the existing *ad valorem* bonds. It is necessary at the outset, in view of our decision in *County of San Diego* v. *Childs, supra,* to compare the two statutes in order that it may clearly appear wherein the 1933 act purports to eliminate the infirmities of the 1931 act.

The 1931 act could be used to refund bonds issued by districts established under the Acquisition and Improvement Act of 1925; the consent of all bondholders was required in all cases; refunding might be had, regardless of delinquency, by consent of all bondholders and all property owners; but where there was delinquency, proceedings might be taken without consent of any property owners. The new bond consisted of the proportionate part of the reassessment allocated to the particular parcel of land; and that reassessment included the total amount of principal of the original bonds with interest, and the estimated expenses of the reassessment and refunding proceedings. Credit was given the property owner for previous payments on the original bonds. In the event of delinquency, the bondholder could require the county treasurer to advertise and sell the property, or could bring his own action of foreclosure. The property owner was liable for costs of the action, attorneys' fees, and not more than $5 for a title search. The redemption period was cut down from five years to one year, and the property owner upon redeeming was required to pay the cost of advertising and $1 for a certificate of sale where the treasurer had sold the land; or 50 cents for service of notice of expiration of the period of redemption, where the bond was foreclosed.

The important provisions of the 1933 act are as follows: It may be used to refund the indebtedness of any *ad valorem* assessment district. The proceedings may be instituted by the legislative board that created the improvement district, with the consent of 75 per cent of the bondholders and the consent of a majority of the electors in the district. (Sec. 15.) In the refunding, the principal of the original bonds must be discounted, and the interest rate on the new bonds must, for at least one payment, be less than that on the outstanding bonds. (Sec. 1.) The legislative body fixes the total amount of the reassessment, the term of years of the refunding bonds, and may provide for an appropriation of money for relief of the district. (Sec. 2.) An election is

then called and the vote of a majority of qualified electors of the district is sufficient to authorize the refunding. If there are no electors in the district, the written assent of the owners of a majority in area of the land therein is sufficient. (Sec. 3.) Upon a favorable vote, the county surveyor or similar officer must prepare a diagram and levy the reassessment. (Sec. 5.) This reassessment is based upon benefits, and credit is given each parcel for prior payments under *ad valorem* assessments. (Sec. 6.) Notice and hearing are given and objections not raised at the hearing are waived. (Secs. 9, 10, 11.) If the assessments are not paid off in cash, the refunding bonds are issued, each representing an assessment upon a specific parcel and payable in annual installments. (Secs. 1417.) The old bonds are canceled and "all unpaid final assessments, taxes levied to pay principal and interest thereon" are "cancelled and annulled". (Sec. 15.) In the event of delinquency, the bondholder may have the property sold by the treasurer, or may bring an action of foreclosure, in which action the property owner is liable for attorneys' fees and costs. (Sec. 20.) The period of redemption is cut down to one year. (Sec. 27.)

From the foregoing summary it may be seen that the chief differences between the two statutes are as follows: (1) The 1931 act required the consent of *all bondholders* for the initiation of refunding proceedings, while the 1933 act requires the consent of only 75 per cent. (2) The 1931 act did not require the consent of any land owner, or the electors of the district, while the 1933 act requires the consent of a majority of electors of the district, or, if there are no electors in the district, the filed assent of the owners of a majority in area of the land. (3) The 1931 act required the reassessment to be in the total amount of outstanding principal and interest of the bonds, plus the expense of refunding proceedings; the 1933 act requires the discounting of some of the principal, the cutting down of at least one interest payment, and the county or municipality not only bears the cost of the proceedings but may contribute some money toward the reduction of the obligation. It is further apparent, however, that the acts are substantially similar in (1) their provision for the additional remedy of foreclosure, with the resulting liability for costs and attorneys' fees placed upon the land owner; (2) their provision for cutting down the period of redemption from five years to one year;

(3) the provisions for modification of the contract without the consent of the land owners, and (4) the changing of the nature of the obligation from an *ad valorem* to a specific lien basis.

The proceeding to refund the bonds of Acquisition and Improvement District No. 67 is the first one instituted under the new statute. The total outstanding indebtedness of the district was $43,185.26. Up to and including the fiscal year 1933–34, assessments in the sum of $34,335.84 had been levied, of which $8,197.63 had been collected, and $26,138.21 was delinquent on April 1, 1935. The fourth assessment, for the tax year 1933–34, resulted in a 93 per cent delinquency. The board of supervisors, on April 16, 1934, adopted a resolution providing for an election within the district on the question of refunding, and submitted a plan of reassessment and refunding. Under this plan the reassessment was to be in the principal sum of $21,592.63, or 50 per cent of the total indebtedness; the county was to pay to bondholders the sum of $10,796.31, or 25 per cent of said total, in cash; and the bondholders were to consent to a discount of 25 per cent of the total amount due. The new bonds were to bear interest at the rate of 6 per cent, whereas the interest rate on the original bonds was 7 per cent. The term of the bonds was increased. The election was held on May 4, 1934, and a favorable vote of the electors within the district of 29 to 0 resulted. The owners of more than 75 per cent of the unpaid bonds then filed their written assent to the plan, and the board of supervisors ordered the respondent county surveyor to make the diagram and reassessment, which he refused to do, claiming that the proceedings were void. No question is raised as to the regularity of the reassessment proceedings, and it may be conceded that they were in conformity with the statute. The questions raised are concerned with the constitutionality of the act.

The first point urged by respondent is that inasmuch as the reassessment plan here worked out calls for a contribution of county funds, it is violative of section 31 of article IV of the state Constitution, prohibiting the gift of public funds. In this refunding proceeding, the county intends to contribute $10,796.31 from public funds. In addition, incidental expenses of the refunding assessment will be paid by the county from public funds. These contributions cannot be held to be gifts of public funds in

violation of the constitutional provision. The bonds here sought to be refunded were issued for the improvement of a public street in the County of Los Angeles. The county, had it seen fit in the first instance, could have paid for this improvement from the general county funds or from the funds received by the county under the provisions of the Gasoline Tax Act. (Cal. Stats. 1933, chap. 481, p. 1249.) It cannot be held that because the county originally proposed to pay for the improvement by assessments levied on those benefited, it cannot now assume a portion of the burden. The exact point has already been decided adversely to respondent by several decisions in this state. (*Reclamation Board* v. *Chambers*, 46 Cal. App. 476 [189 Pac. 479]; *Sacramento & San Joaquin Drainage Dist.* v. *Riley*, 199 Cal. 668 [251 Pac. 207]; *Reclamation Board* v. *Riley*, 206 Cal. 661 [284 Pac. 668].) These cases conclusively determine that such contributions, under the circumstances here disclosed, do not constitute gifts of public funds within the meaning of the constitutional provision.

The major question presented is whether the 1933 refunding statute impairs the obligation of any contract, either of the land owner or bond owner, or infringes upon vested rights, in violation of the federal and California Constitutions. We turn to a discussion of this problem.

█ When a district is formed, assessments are levied, and bonds are issued, there is, of course, a contractual relationship between the state or its agency on the one hand and the bondholder on the other. It is also the settled doctrine in California that by such proceedings, a contractual relationship arises as far as the property owner is concerned. This doctrine that a street assessment constitutes a contract with the land owners was given its first authoritative statement in this state in the case of *Chapman* v. *Jocelyn*, 182 Cal. 294 [187 Pac. 962], and it has been since uniformly followed and approved in this state. (*Jeffreys* v. *Point Richmond Canal etc. Co.*, 202 Cal. 290 [260 Pac. 548]; *County of San Diego* v. *Childs, supra; Sammon* v. *Wing*, 105 Cal. App. 689 [288 Pac. 711]; *Warden* v. *Barnes*, 111 Cal. App. 287 [295 Pac. 569]; *Security Trust & Savings Bank* v. *City of Los Angeles*, 120 Cal. App. 518 [7 Pac. (2d) 1061].)

The application of the doctrine was the basis of the decision in *San Diego* v. *Childs, supra*, holding the 1931 refund-

ing act unconstitutional. We there said: "It is likewise the well-settled law of this state that when valid proceedings for improvements by special assessment have been completed and bonds have been issued to represent the assessments, a contractual relation between the property owner and the bondholder has been established. In *Chapman* v. *Jocelyn*, 182 Cal. 294 [187 Pac. 962, 963], it was said: 'A street assessment is a contract and the provisions of the statute in force at the time, providing the manner of its enforcement are a part of such contract. (*Creighton* v. *Pragg*, 21 Cal. 115; *Houston* v. *McKenna*, 22 Cal. 550, 553.) . . . The Constitution forbids the passage of a law impairing the obligation of a contract. (Art. I, sec. 16.) It follows that a law enacted after such contract is made, and which materially alters the remedy of the bondholder to enforce his lien by means of a sale, or the rights of the owner under the law existing at the time the bond was issued, cannot apply to previous contracts and can have only a prospective effect.'

"The same rule was applied and was deemed controlling in *Jeffreys* v. *Point Richmond Canal etc. Co.*, 202 Cal. 290 [260 Pac. 548]. In that case the holder of street assessment bonds issued under the Improvement Act of 1911, sued to foreclose the bonds. At the time the bonds were issued the law did not provide for foreclosure by suit on the part of the bondholder. After the bonds were issued the statute was amended to authorize such a suit as 'a separate, district and cumulative remedy' available to the bondholder. It was held that the right of property owners against whose property assessments had been levied and bonds issued therefor under the 1911 act became vested prior to the amendment and could not constitutionally be affected thereby, even under the guise of an additional remedy, as it adversely affected a substantial right of the property owner. . . .

"The petitioner necessarily concedes that if it prevail the cases of *Chapman* v. *Jocelyn, supra, Jeffreys* v. *Point Richmond Canal Co., supra,* and other cases in this state to the same effect, must be overruled. It is insisted that they be not followed for the stated reason that they are ill-considered, are contrary to the doctrine of other cases in this state and contrary to decisions in other jurisdictions. The California cases cited as authority for the statement are not in point. Three of them correctly hold that the property owner is not a party to the improvement contract and the

others are not inconsistent with the declared doctrine that when the special assessment proceedings are completed a contractual relation arises as between the bondholder and the property owner to such an extent that the substantial rights of either may not be impaired by subsequent legislation. It may be conceded that cases in other jurisdictions are in support of the petitioner's position, but we cannot agree that those against its contentions in this state are ill considered. They are based on sound principles of public policy for the protection of both the bondholder and the property owner. In any event they are the established law of this state and as they constitute a rule of property they should not be set aside except for cogent reason not now made to appear.''

With the nature of the land owners' rights and obligations under the original *ad valorem* bonds in mind, we find, upon an examination of the present statute, that it makes three important changes: (1) change in the nature of the obligation; (2) shortening of period of redemption; (3) addition of remedy of foreclosure. Each of these several changes constitutes an impairment of the contract of the land owners, unless such land owners have consented thereto. We will first discuss the impairment point and then will discuss the question as to whether the land owners have assented to such impairment.

The nature of the obligation is changed from an *ad valorem* basis to a specific lien. Instead of being liable for an indefinite number of general *ad valorem* assessments, the land owner is liable for a definite total sum, secured by a specific lien on the property. From a common-sense view, this change, under the act here involved, is beneficial to the interests of the land owner. Under the plan here involved, the principal of the bonds is reduced 50 per cent, the interest rate reduced, and the term of payment extended. The land owner is released .from the contingent liability to meet the obligations of other owners. However, whether the property owner can be forced, against his will, to accept this change in the nature of his obligation raises several constitutional points which we think are disposed of in the discussion hereinafter appearing. It is obvious that if by proper statutory provision the consent of the *property owner* is first obtained to such a change, there would be no

violation of his constitutional rights. This will be discussed hereafter.

The other two important changes—the shortening of the period of redemption and subjecting the land owner to the additional remedy of foreclosure, with costs and attorneys' fees—received consideration by this court in the *County of San Diego* v. *Childs, supra,* in which it was held that both changes constituted impairments of the contract rights of the land owner. The rule is well established in all jurisdictions, even in those states that do not hold as does California, that the assessment constitutes a contract as far as the property owner is concerned, that redemption is governed by the law in force at the time of sale. Once the sale for delinquency is made, the right to redeem under the law as it then exists is one which the legislature cannot alter. In the instant case, a great many parcels have already been sold to the state. It is obvious, therefore, that unless the property owners consent thereto, the provision of the statute which purports to reduce the period of redemption from five years to one year, as to the owners of those parcels already sold to the state, is unconstitutional. This was one of the points expressly decided in the Childs case, *supra* (p. 119):

 "It has been held by a long and unbroken line of decisions in this state that the law in force at the time of a sale for nonpayment of taxes governs the right of redemption. The question presented in *Teralta Land etc. Co.* v. *Shaffer,* 116 Cal. 518 [46 Pac. 613, 615, 58 Am. St. Rep. 194], was: 'Can the legislature, after a tax sale, lawfully amend the law so as to apply new and more onerous conditions to the right to redeem than those which existed when the sale was made?' The question was answered in the negative on the authority of textwriters and the adjudicated cases. This court quoted with approval from Black on Tax Titles, section 175, as follows: 'The right of redemption from a tax sale must be governed by the law in force at the time of sale; it cannot be affected by subsequent legislation,' and the following from Blackwell on Tax Titles, fifth edition, section 729: 'The law in being at the time of sale governs the right of redemption. The time can be neither lengthened nor shortened by subsequent legislation. . . . The right to redeem is a condition attached to the sale, and the legislature cannot defeat it by a subsequent act. A

provision affecting the period of redemption can only apply to sales made after the day on which the act took effect.' The following is quoted from *Merrill* v. *Dearing*, 32 Minn. 479 [21 N. W. 721], in support of the rule with the citation of numerous other cases: 'The right of property acquired by the purchaser at this sale and the right of redemption remaining to the owner must both be governed by the law in force at the time of sale. Neither, in our judgment, could be either abridged or enlarged by subsequent legislation. This is unquestionably so as to the right of the purchaser. The same rule ought to apply in favor of the owner as against any statute shortening the time to redeem, as it is equally unjust to legislate against the owner of the land as in his favor.' This court continued, at page 525: 'The enforced sale of property on execution, or for the nonpayment of taxes, institutes a contract with the purchaser which cannot be materially altered without his consent. The right of the owner to redeem is perhaps, strictly speaking, one not resting in contract, but is a right vested in him under the law, a right pertaining to the contract itself, and which in reason and justice is not more open to attack than that of the purchaser.' The rule has consistently been followed in this state.''

Petitioner and *amici curiae* assert, however, that the rule just stated does not apply because there is in fact no shortening of the period of redemption before sale. The argument is that under section 15 of the 1933 act, upon the issuance of the refunding bonds, the old bonds are canceled; that all proceedings to enforce the old bonds fall with such cancellation; that all sales for delinquency theretofore made are wiped out and the owners' rights are unaffected thereby; that the new bonds represent a new obligation and, upon any delinquencies occurring thereafter, the tax sale will be governed by the new law. However, it cannot be denied that the right of the property owner to redeem became fixed at the time of sale. At that time, he had a five-year period to redeem. Under the new law, he is given one year to redeem. To hold that this can be done indirectly when it admittedly cannot be done directly would be to place the entire emphasis on the form of the transaction rather than its substance. We cannot hold that constitutional rights may thus be taken away without the consent of the land owner. We think that unless

the land owners have consented to this change the 1933 act is subject, on this point, to identically the same objections as was the 1931 act and, under the decision of this court in the Childs case, must be held unconstitutional, for the reasons therein advanced.

■ The same reasoning applies to the foreclosure provisions of the 1933 act. Under the Acquisition and Improvement Act of 1925, upon default, the property was sold at a regular tax sale. This was the sole remedy given the bondholder by the 1925 act. Under the refunding act of 1933, however, the bondholder is given the additional remedy of foreclosure and the land owner is made liable for costs and attorneys' fees. These provisions are substantially the same as those included in the 1931 act. Under that act, in the Childs case, *supra,* it was held that such provisions, although dealing with the remedy, undoubtedly add to the land owner's obligation and, therefore, constitute an impairment of the land owner's contract. (See, also, *Jeffreys* v. *Point Richmond Canal etc. Co., supra; Sammon* v. *Wing,* 105 Cal. App. 689 [288 Pac. 711].) The case of *Lincoln* v. *Superior Court,* 2 Cal. (2d) 127 [39 Pac. (2d) 405], in which we upheld the retroactive application of the 1933 statute giving the creditor under a deed of trust the additional remedy of foreclosure, where formerly only a statutory sale could be had, is not in conflict with the above decisions. The contract involved therein did not specify sale as the exclusive remedy; on the contrary, it gave broad powers to the trustee to commence "any action or proceeding" affecting the security. This court declared that such provision was "sufficiently comprehensive to include any remedies subsequently authorized by the legislature for the protection of the beneficiary's rights or enforcement of the trustor's obligations under the instrument". It was also pointed out that by virtue of the alternative remedy, the debtor gained a right, the statutory right of redemption. In the instant case the statute and bonds, by necessary implication, provided for an exclusive remedy, and this distinguishes the Lincoln case from the bond decisions above cited. For the foregoing reasons it necessarily follows that the foreclosure provisions of the 1933 act must be held to constitute an impairment of the land owner's contract, unless it be found that the land owner has consented to the change.

■ The conclusion that the 1933 refunding act, like its 1931 predecessor, for the foregoing reasons impairs the obligation of the contract with the land owner inevitably follows from the decision in the Childs case, *supra*. However, counsel for petitioner and *amici curiae* advance three propositions, seeking to avoid this result. The first is that the contract doctrine is wrong and should be abandoned. They argue that the assessment is an exercise of the sovereign power of taxation, and that the obligation to pay it arises by law and not by consent. *Chapman* v. *Jocelyn, supra,* and the whole group of cases following it, are condemned as wrong in principle and in conflict with the great weight of authority elsewhere. The identical argument was made in the Childs case and we there reaffirmed the doctrine, declaring it to be the established law of this state and a rule of property. The contract theory having become a rule of property, we are not disposed to overrule it at this late date. It is, therefore, unnecessary to discuss in detail petitioner's argument in this connection.

■ It is further suggested by petitioner that if the contract doctrine be not abandoned, it should be strictly limited. It is contended that since the doctrine had its origin in an assessment which constituted a specific lien against the property, it should not be applied to bonds supported by *ad valorem* assessments. We are unable to perceive any reason for this distinction, and as already seen, it would be directly in conflict with the Childs case.

■ The third and final argument of petitioner in this connection is that, assuming the applicability of the contract doctrine, the obstacle is, nevertheless, overcome by the provision found in the 1933 act requiring the refunding to be approved by a majority of the electors residing within the district. This provision was not found in the 1931 act and there is no reason to dispute petitioner's statement that this provision was intended to overcome the infirmities of the 1931 statute, as pointed out in the Childs case. The basis of this argument is that since a majority of the electors in the district have approved the refunding, such approval is binding on all the property owners in the district and they must be deemed to have consented to the change. Of course, if the land owners consent to a change in the contract, there cannot be impairment as to them. If the land owners have consented to the reassessment then all of the arguments

of respondent as to shortening the period of redemption, adding the remedy of foreclosure, and changing the nature of the assessments are of no avail. This consent argument, if based on the proper foundation, would be a complete answer to every objection now urged by the land owner. There can be no impairment if the contracting parties consent thereto. The difficulty with the present act is, as will be pointed out, that it does not require or even permit the consent of any land owner in the district, unless there are no electors in the district.

Under the provisions of the Acquisition and Improvement District Act of 1925, as originally enacted, there was no provision requiring the consent of the land owners to the creation of the district or the issuing of the bonds. By section 9 of the act, as it originally read, and as it read when the bonds herein sought to be refunded were issued, it was provided that land owners could protest, and that a protest of the owners of over half the area could be overridden by a four-fifths vote of the legislative body authorized to create the district. This section was amended in 1931 (Stats. 1931, chap. 744, p. 1550) to provide that in the event a majority in area of the owners protested the legislative body was without power to continue with the improvement. Under the law as it existed in 1925, and as it existed when the bonds involved herein were issued, the legislative body could override the protests of all the property owners, and could create the district and cause bonds to be issued over the objections of all the land owners. When the bonds were issued they became a contract with the land owner, under the cases already cited. Since this contract could come into existence against the will of the land owners, one of the contracting parties, it must be a contract created by operation of law. Once it becomes a contract it cannot be impaired without the consent of the land owner. But we do not have to indulge in any strained construction to hold that such contract may be changed or modified by a majority vote of the land owners, provided the legislature sees fit to provide for such a change. There is persuasive, if not conclusive, authority that a majority vote is sufficient to authorize a modification of the contract as far as the land owners are concerned. In *Mulcahy* v. *Baldwin*, 216 Cal. 517 [15 Pac. (2d) 738], an irrigation district authorized a bond issue by a two-thirds vote of the electors of the dis-

trict. Subsequently, by a majority vote, a refunding issue was authorized. The same argument as to the impairment of the obligation of the contract of the land owners was made. At page 526 [216 Cal.] it is stated:

"It is also contended that rights of contract with the land owners upon the organization of the district will be impaired by the proceedings under the new legislation. It is elementary that there can be no impairment of a contract by a change thereof if the change is effected with the consent of the contracting party affected thereby. Here there can be no change in the landowners' contract for the issuance of new bonds without the consent of a majority of the electors of the district, just as there could be no contract in the first instance without their consent. The vote of the electors in each instance must be deemed to be binding on the land owners. There is no constitutional requirement of a favorable two-thirds vote in the authorization of a bond issue of such a district. A majority vote would seem to be in harmony with our system and form of government."

See, also, *Palo Verde Irr. Dist.* v. *Seeley*, 198 Cal. 477 [245 Pac. 1092]; *County of San Diego* v. *Childs, supra,* page 123 [217 Cal.].

It necessarily follows that, if the 1933 refunding act *required* the consent of the *owners* of over half of the area involved, it would meet all objections of respondent as far as the contract clause is concerned. There would be no impairment of the obligation of the contract, as far as the land owners are concerned, because they would have consented to the changes made in their respective obligations. The difficulty with the 1933 act is that it does not require or even permit the owners of over half the area involved to approve the plan of refunding. The only right conferred on the land owner as such is the right to protest, but there is no provision that the protests of the owners of one-half the area or more will kill the refunding plan. Section 1 of the 1933 act provides that the refunding may be done by the legislative board that created the improvement, with the consent of the electors of the district. Section 3 provides that an election shall be called on the question of the refunding and that it shall be necessary to secure a majority vote of the electors before the refunding may proceed. In the event there are no electors within the district, a situation not here involved, then and only then may the refunding be

authorized by the land owners. It is obvious that in many, if not most districts the electors residing therein will not consist of the land owners liable for the assessment.

Petitioner urges that in the Mulcahy and Palo Verde cases above referred to we recognize that a vote of the electors could bind the land owners. This is true, but in those cases the original bonds were authorized by the electors and this included the implied authority that the same group should have authority to change or modify the contract created by the bond. So far as those cases involving irrigation, reclamation and drainage districts are concerned, they are not in point except in so far as they recognize the principle of the majority vote being binding on the minority. Moreover, it should be mentioned that by article XI, section 13, of the Constitution, the legislature has broad plenary powers over those districts which it does not possess over the type of district here involved. In a situation where neither the land owner nor the electors authorized directly or indirectly the issuance of the original bonds, we cannot hold that a majority vote of one group, the electors, can change the constitutional rights of another group, the land owners.

The consent of the owners of over half the area of the district to the refunding, in order to be binding on the minority, must be a consent required by the statute and not a mere informal consent not provided for in the statute. The petition herein alleges that the owners of a majority of the area within the district petitioned the board of supervisors of Los Angeles County "requesting that refunding proceedings be taken in accordance with the provisions" of the 1933 refunding act. For two reasons this cannot be held to constitute a sufficient consent of a majority of the landlords to modify the contract. In the first place, it was a mere request that "refunding proceedings be taken" and in no sense can it be held to be an approval of the ultimate plan that was worked out. At the time the petition was filed, no one knew what the amount of the reassessment was to be, the rate of interest on or the term of the new bonds. In the second place, the 1933 refunding act contains no provision authorizing such a petition to be filed. The act does not contain any provision giving the owners of over half the area in the district the right or power to consent to the refunding. Under such circumstances, the informal, extra-legal petition shown by the record cannot

be held to be the consent necessary to make the reassessment binding on the minority of the land owners. In order to constitute a consent on the part of the land owners, and to permit the owners of over half the area to bind all the land owners, the consent must be one required by the statute.

■ Petitioner's last argument on this point is that, assuming the 1933 refunding act constitutes an impairment of the obligations of the land owner's contract, such impairment is justified under a reasonable exercise of the police power. Great reliance is placed by petitioner and *amici curiae* in its behalf on the case of *Home Building & Loan Assn.* v. *Blaisdell*, 290 U. S. 398, 429 [54 Sup. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481]. The holding in that case is now so well known and understood that no useful purpose would be served by reviewing it here. Sufficient it is to say that it was there held that a moratorium statute which *postponed* the enforcement of a contract for a limited time, without affecting the substantial rights of the creditor, was justifiable under the police power. The 1933 statute here involved, although it was undoubtedly intended to meet an emergency, is not limited as to time, nor does it merely postpone the enforcement of the contract. By the 1933 refunding act the contract of the land owners is completely changed. Such a complete change in the nature of the contract cannot be justified under the police power. This has been the holding of the United States Supreme Court in cases subsequent to the Blaisdell case. (See *W. B. Worthen Co.* v. *Thomas*, 292 U. S. 426 [54 Sup. Ct. 816, 78 L. Ed. 1344, 93 A. L. R. 173], and *W. B. Worthen Co.* v. *Kavanaugh*, 295 U. S. 56 [55 Sup. Ct. 555, 79 L. Ed. 1298, 97 A. L. R. 905], No. 556, Supreme Court of the United States, decided April 1, 1935.) The point is so self-evident that no further discussion is required.

■ The second ground of unconstitutionality urged by respondent is that by the 1933 act the contract of the bondholders has been impaired. As already stated, the act provides that the refunding may take place when 75 per cent of the holders of outstanding bonds consent. Under the refunding scheme, the nature of the security is changed and the principal and interest of the bonds are reduced. It is plain, therefore, that the obligation of the existing bonds is impaired. As to the 75 per cent or more bondholders who consent, there is, of course, no complaint. But as to

the nonconsenting bondholders, including those who are absent and those incapacitated or incompetent, who may hold up to 25 per cent of the bonds, there is an obvious impairment, if their bonds are canceled and they are forced to take new bonds with a different security, in a lesser amount, and bearing a reduced interest, or if their security is lessened. Is this the effect of the act? Respondent claims that it is. He points out that the act makes no specific provision for safeguarding the rights of the nonconsenting bondholders, but leaves those rights entirely·"up in the air"; that, although no attempt may be made to cancel these bonds, still no provision is made for their payment, unless the *ad valorem* tax provisions of the old statute are left in force, in which case the property owner would be liable not only for the new obligation, but for further *ad valorem* assessments in an indefinite amount to pay off these old bonds. It is further pointed out that in substituting the new specific lien bonds for the old *ad valorem* bonds, there is no means provided for their apportionment among the existing bondholders, that is, it cannot be determined which of the new bonds will go to the 75 per cent of consenting bondholders. Respondent points out also that, although it might be possible to work out the problem under the federal Bankruptcy Act, as amended, or by negotiation with the nonconsenting bondholders, resulting in purchase or payment of their obligations by the other bondholders or by the county, still the act does not so provide.

Counsel for petitioner and *amici curiae* in its behalf, in oral argument and in their final briefs, concede that no change can be made in the bondholders' contract, unless 100 per cent of the bondholders consent thereto, or unless some provision is made for all dissenting bondholders. There can be no doubt that it is indispensable, from a constitutional standpoint, so far as bondholders are concerned, that either 100 per cent consent to the change or that the dissenting bondholders be so taken care of that no impairment of their contract ensues. Petitioner contends, however, that the act may be interpreted to require the satisfactory adjustment of the rights of all nonconsenting bondholders before the refunding can be actually effective. Section 15 of the act, upon which they rely, provides, it would seem, for two situations: (1) Where all bondholders consent at the outset. The statute reads: "All moneys collected on the reassess-

ments, and *all refunding bonds* shall be paid and delivered to *the holders of the original bonds* in such amounts and proportions as may be agreed upon between the legislative body and the bondholders, or as may be provided by law; provided, however, that prior to said payment and delivery or concurrently therewith, *said bondholders* must deliver up the unpaid refunded bonds for cancellation, and same shall forthwith be cancelled." This sentence undoubtedly contemplates consent of all bondholders, and is inapplicable to the situation before us in this case. (2) Where not all bondholders consent at the outset. The statute provides in the next sentence: "In the event that all of the outstanding bonds are not exchanged for such refunding bonds, nevertheless, if 75 per cent or more of the outstanding bonds are exchanged for such refunding bonds, the legislative body shall have authority to issue such refunding bonds under the provisions of this act and to do and perform *all acts necessary or convenient for the retirement or payment of the outstanding bonds* not surrendered for exchange and cancellation."

It is the contention of petitioner that by this language the legislature has recognized and protected the rights of nonconsenting bondholders; and that the broad terms of the provision do not leave those rights "up in the air", but give the legislative body the option of a number of methods of satisfying such bondholders, not limiting it to any one. They suggest that at the time the refunding bonds are issued, funds must be set aside sufficient to pay matured bonds of nonconsenting holders, and sufficient, also, to pay principal and interest on unmatured bonds of nonconsenting holders, when due. Another method proposed is the sale of such refunding bonds as cannot be exchanged, and the deposit of the proceeds in an interest and sinking fund, together with other money furnished by the city or county, or by the remaining bondholders, to meet the claims of nonconsenting holders. In short, they conclude that where the statute provides for authority to do all things "necessary or convenient for the retirement or payment of the outstanding bonds", it contemplates that all acts *shall* be performed which may be essential to protect rights of nonconsenting bondholders; and, so construed, it is not violative of any constitutional guarantee.

With this concession made by petitioner, the problem becomes one of interpretation rather than constitutionality. They admit that the proceedings cannot be completely effective without the consent of 100 per cent of the bondholders, and all they demand is that those proceedings be initiated when the requisite 75 per cent has been obtained. They admit that no bond can be canceled, or the obligation represented by it impaired in any way, unless the consent of the holder be first obtained, or unless some adequate means of payment be made.

We are of the opinion that in spite of the concessions made by petitioner, and giving the act the broadest and most liberal interpretation, we cannot hold that the present act adequately safeguards the rights of dissenting bondholders. Any act, to meet constitutional tests as far as the bondholders are concerned, must provide either for the consent of all the bondholders, or the rights of the dissenting bondholders must be protected. The exact means to be employed to protect these rights is, of course, a matter for legislative determination.

In closing this opinion we think it well to summarize our holdings herein.

1. The 1933 refunding act impairs the obligation of the contract of the land owner in that it changes the nature of the land owner's obligation, reduces the period of redemption, and imposes upon him the expenses of foreclosure.

2. All of these objections, as far as the land owners are concerned, could be met by a provision requiring the consent of the owners of over half the area to approve the reassessment plan.

3. The provision in the present act requiring a majority vote of the electors to approve the plan is not sufficient.

4. The act is unconstitutional in that it fails adequately to protect the rights of dissenting bondholders.

For the foregoing reasons, the alternative writ is discharged and the application for a peremptory writ is denied.