123 P.2d 389

## DURAND v. MIDDLE RIO GRANDE CONSERVANCY DIST. et al.

### No. 4613.

Supreme Court of New Mexico.

Aug. 13, 1941.

Rehearing Denied March 21, 1942.

R. F. Deacon Arledge, of Albuquerque, for appellant.

Stanley Miller and George R. Craig, both of Albuquerque, for appellees.

BRICE, Chief Justice.

This is an action for a declaratory judgment, and the question is whether the act of the New Mexico legislature, approved October 3, 1940, hereinafter called "The Relief Act," is unconstitutional.

The legislature of 1923 enacted Ch. 140 entitled: "An Act to Provide for the Organization of Conservancy Districts for the Purpose of Co-operating With the Government of the United States Under the Terms of the Federal Reclamation Law and Other Federal Laws, and to Define the Purposes and Powers Thereof," for which was substituted Ch. 45, N.M.L.1927, entitled: "An Act to Provide for the Organization of Conservancy Districts, to Define the Purposes and Powers Thereof and to Repeal Chapter 140 of the Session Laws of New. Mexico, 1923, and All Acts or Parts of Acts in Conflict With Any Provision of This Act."

The appellee, Middle Rio Grande Conservancy District (hereinafter called "The District") was organized under the act of 1923 and its existence continued under the act of 1927 and amendments thereto. Ch. 50, N.M.L.1931; Ch. 80, N.M.L.1933, and Chs. 37 and 150, N.M.L.1935. Such portions of the Conservancy Act (Act of 1927 and amendments) as are material to a decision of this case will be referred to in this opinion.

The appellees, Frank Butt, Onofre F. Sandoval, L. E. Ruffin, Froilan Chavez and George C. Sickles are sued individually and as members of, and constituting, the Board of Directors of the appellee district. The State of New Mexico was made a party under authority of a provision of the Conservancy Act.

The powers of the District conferred by the act are as follows:

"(a)   Preventing floods;

"(b)   Regulating stream channels by changing, widening or deepening the same;

"(c)   Regulating the flow of streams;

"(d)   Diverting, controlling, or in whole or in part eliminating water courses;

"(e)   Reclaiming, draining, or filling wet and overflowed lands;

"(f)   Of providing for irrigation where it may be needed and otherwise benefiting and developing agricultural lands or lands susceptible of irrigation or agricultural development. '

"(g)   Protecting public and private property from inundation."

Section 201.

Specific incidental powers are conferred to enable the accomplishment of the general powers above stated.  The Conservancy Act provides that upon organization: "The district shall be a political subdivision of the State of New Mexico and a body corporate with all the powers of a public or municipal corporation; shall have power to sue and be sued, to incur debts, liabilities and obligations, to exercise the right of eminent domain and of taxation and assessment as herein provided, to issue negotiable bonds; and to do and perform all acts herein expressly authorized, and all acts necessary and proper for carrying out the purposes for which the district was created and for exercising the powers with which it is invested."  Section 206(2).

Subsequent to the organization of the District, a plan was adopted and approved for the construction of improvements authorized by the Conservancy Act, estimated to cost approximately $9,600,000.  It was determined that the benefits resulting from the execution of the plan would be $22,000,000, and against these benefits there was levied an assessment aggregating in round numbers $9,716,000, which was apportioned, and an amount levied upon each lot, tract, and parcel of land benefited, in the proportion that the respective appraised benefits on such lot or land bear to the total appraised benefits.  Certain cash payments were made, which left the uncollected construction fund assessment at about $9,697,000.  This amount, it was provided, should be paid in forty annual installments, beginning February 28, 1934, with interest on unpaid installments at the rate of five and a half per cent per annum, payable semiannually each six months after February 28, 1929.

Thereafter the District, acting within the authority provided by the Conservancy Act, executed, sold and delivered its bonds (special obligations of the District) bearing date August 1, 1929, in the total aggregate amount of $8,700,000, bearing interest at five and a half per cent per annum, payable semiannually, said bonds to mature at annual intervals, commencing the first day of August, 1934, and ending the first day of August, 1973; the principal and interest thereof to be paid out of the annual assessments and interest thereon levied against the benefited lands.

By Ch. 150, N.M.L.1935, Conservancy Districts were authorized to issue refund-

ing bonds for the purpose of refunding, readjusting, or extending the whole or any part of the bonded indebtedness of such districts; and acting thereunder the District issued its refunding bonds, dated August 1, 1937, in the sum of $8,403,000 in exchange for its bonds issued August 1, 1929, which will mature at annual intervals beginning August 1, 1943. The new obligations bear interest at the rate of four percent per annum, payable semiannually. The refunding bonds are secured, and are to be paid, in the same manner and by the same means as the original issue; but the times of payment of assessments were extended to correspond with the maturity of the refunding bonds. It is agreed that the refunding bonds are binding obligations of the District.

The apportioned construction fund assessment of $9,700,000 is to be paid in forty annual installments of principal, beginning February 28, 1934, and ending February 28, 1973, with interest thereon payable semiannually at five and a half per cent per annum. A portion of the construction fund assessment was levied against the city of Albuquerque, which is situated within the district, and one-fortieth thereof, with interest, is paid annually as general taxes are paid. The remainder is assessed against approximately 100,000 acres of agricultural land within the district. One thirty-sixth of the District's refunding bonds mature annually and are payable with interest from the annual installments levied against the benefited property and interest thereon, beginning in 1943.

The bond issue provided for by the Conservancy Act cannot exceed ninety per cent of the levy for construction. The excess constitutes a contingent fund with which to protect the bonds from casual default; but the portion (if any) not needed for this purpose may be transferred to the maintenance fund. The Board is required to take into account maturing bonds and interest and to make ample provision for their payment. A sufficient amount of the assessments must be applied by the Board to the payment of principal and interest thereon, and when collected must be set apart in a separate fund for that purpose, and used for no other. In case the proceeds of the original assessment are not sufficient to punctually pay the principal and interest upon outstanding bonds, then the board is required to make additional levies for such purpose, which must not, as to any tract, exceed its assessment for benefits. "Under no circumstances shall any assessment levies be made that will in any manner, or to any extent, impair the security of any bond issued hereunder, or the fund available for the payment of the principal thereof and interest thereon." Laws 1927, c. 45, § 506(3) (b).

Provision is made for a maintenance fund by a limited annual levy apportioned upon the basis of the total appraisal of benefits.

The effect is that each tract or parcel of land is burdened with its proportionate part

of the construction fund assessment, which may be increased to the amount of the assessment of benefits (more than double) in case such assessment is not sufficient to punctually pay the principal of maturing bonds and interest thereon; and likewise each tract and parcel of land is burdened with its proportion of the annual assessment for maintenance, based upon its assessment for benefits.

On the 13th day of September, 1940, the Honorable John E. Miles, Governor of the State of New Mexico, as authorized by § 6 of Art. 4 of the Constitution of the state, by proclamation, called a special session of the 14th Legislature of the State of New Mexico, to convene in the City of Santa Fe on the 30th day of September, 1940: "For the single purpose of enacting a law for the relief of the owners of agricultural lands not in a state of cultivation, located within the boundaries of conservancy districts now organized and operating under the provisions of the Conservancy Act of New Mexico, by deferring and reinstating the collection of assessments levied for the purposes contemplated by said Act."

Pursuant to said proclamation, the legislature met at the time and place specified and enacted the Relief Act, entitled: "An Act Relating to Conservancy Districts Now Organized and Operating Under the Provisions of the Conservancy Act of New Mexico; Providing for the Relief of the Owners of Agricultural Lands Not in a State of Cultivation Located Within the Boundaries of Such Districts By Deferring and Readjusting the Collection of Assessments Levied Upon Such Lands; Providing for the Capitalization of Such Deferred Assessments and the Ultimate Collection and Use Thereof; Defining the Procedure to Be Taken in Effectuating the Provisions of This Act; Authorizing the Issue of Refunding Bonds When Necessary to Effectuate the Provisions of This Act; Repealing All Acts or Parts of Acts in Conflict With the Provisions of This Act; and Declaring an Emergency." Laws 1940, Sp.Sess. c. 1.

Among the provisions of the Relief Act are the following: The Board is authorized to divide the agricultural land into two classes; that which is in a state of cultivation and that which is not, and to enter an order identifying the uncultivated agricultural lands and provide that no assessments thereafter levied thereon (except an annual assessment of 25 cents per acre for maintenance) should be certified for collection before July 1, 1955, except as to land which prior to said date shall be placed in a state of cultivation. After 1955 all agricultural lands within the district, whether in a state of cultivation or not, will be alike subject to the payment of the annual installment levied for construction.

Nothing contained in the Act shall relieve uncultivated agricultural land from the existing lien of assessments. Levies theretofore made and unpaid at the effective date of the Act, and those deferred under its provisions, shall be capitalized, and the total thereof *without interest* be there-

after due and payable in that number of equal annual installments, not exceeding fifteen, which corresponds with the number of deferred annual installments; the first of which shall be due in 1955. Thereafter each installment shall be certified for collection and collected as provided in the Conservancy Act; and "The proceeds of all such collections shall be divided by the Board between the Construction Fund and the Maintenance Fund of the District in such proportions as the Board may by order determine to be for the best interests of the District." Laws 1940, Sp.Sess. c. 1, § 6. Notwithstanding the deferment of collections of assessments on uncultivated agricultural land, the Board shall nevertheless levy and order the collection annually of assessments in total sums sufficient to pay the maturing bonds and interest, and levy and collect the maintenance fund, subject only to the condition that no levy against any item of property for the construction fund shall exceed its appraised benefits.

Acting under this provision of the statute, the Board determined that there were approximately 58,000 acres of cultivated agricultural land and 40,000 acres of uncultivated agricultural lands within the district upon which assessments for benefits, construction and maintenance have been levied; regarding which the Board has ordered that payments of installments for construction shall begin July 1, 1955.

The Act provides that "for the purpose of adjusting and refunding the payment of its bonded indebtedness of every character outstanding at the effective date of this Act or in order to avail itself [the district] of the benefits of this Act," a district may issue refunding bonds, each identical in effect with the corresponding outstanding bond to be refunded, except as to date.

Also, " * * * Such refunding bonds, with the consent of the holders of the bonds to be refunded, shall be issued in exchange, dollar for dollar, for the bonds refunded. * * * The refunding bonds may be delivered from time to time and in such amounts as may be necessary to accomplish the purposes of this section, and shall be incontestable in the hands of bona fide purchasers or holders thereof for value. * * * Refunding bonds issued under this section shall rank on a parity with all other bonds of the issue or issues refunded in part thereby, and shall in all respects be deemed substituted for the particular bonds refunded thereby and shall be entitled to the same security and payable from the same funds as the bonds refunded, subject, however, to the adjustment of the collection of assessments levied against agricultural lands not in a state of cultivation, as contemplated by this Act. For the payment of the refunding bonds, the district shall be required to levy and collect the same assessments, taxes and charges, with the exception aforesaid, as it would have been required to do for the payment of the bonds refunded."

In round figures the annual payments on the principal of the refunding bonds is

$280,000, beginning August 1, 1943, and the annual interest payments for the years up to and including 1943, are or will be, $326,-000. In 1943 the payments due on principal and interest will be $556,000, which will decrease about $11,200 each year thereafter until paid, if installments of principal due annually are paid at the due date. Of this amount ninety percent is paid out of assessments against agricultural land.

In anticipation of delinquencies on the part of some of the land owners, the annual assessments for construction were made larger than the annual payments on the bonds. Also, the assessments bear 5½ per cent interest and the bonds 4 per cent.

The record does not disclose the amount of assessments levied for benefits or construction against the 40,000 acres of uncultivated land. No classifications were made originally, but the District's board, in assessing benefits, must have taken into consideration the fact that some lands were not in a state of cultivation. The Relief Act does not purport to re-assess benefits, but confirms the original assessment by ordering the continuation of the levy for construction to be made upon that basis.

We must assume then that the assessments of benefits were correct, and if the Act is to be held constitutional, we must find justification for the apparent discrimination against the cultivated land authorized by the Relief Act.

This is attempted to be done by the Act itself, the first paragraph of which is as follows: "Declaration. The relief, in the manner set forth in this Act, of the owners of agricultural lands not in a state of cultivation, as that term is defined by this Act, located within the boundaries of any conservancy district now organized and now operating under the provisions of the Conservancy Act of New Mexico, is hereby declared to be for the general welfare of the people of the State of New Mexico, for the special benefit of all property subject to assessment under the provisions of said Conservancy Act of New Mexico, and designed to promote the speedy reduction of such lands to a state of cultivation."

The legislative declaration is not a construction of the statute, but is the legislature's statement of purpose and conclusion as to its practical effect. But it does not follow that an arbitrary and discriminatory apportionment of assessments can be made consistently with the Fourteenth Amendment, notwithstanding the good intention implied by the declaration. The legislature cannot circumvent the state or federal constitution by a finding that the act does not run counter to either, if in fact it does.

The practical effect of enforcing the provisions of the Conservancy Act is that the uncultivated lands, though benefited as originally assessed, may pay their part of the burden in fifteen annual installments without interest, beginning in 1955. The rebated interest alone would equal or exceed the principal assessment. In the meantime, the cultivated land must not only bear the burden of interest charged to it, and pay

its annual installments of assessments, but is subject to additional assessments for construction to supply funds for any deficiencies caused by the deferred payment of principal and rebate of interest thereon, of assessments against the uncultivated land.

The appellants have presented eighteen separate grounds upon which it is asserted that the Relief Act is void for constitutional reasons, two only of which need be considered: Does the Act run counter to the Fourteenth Amendment or to art. 1, § 10, the Contract Clause of the Constitution of the United States?

While there is some conflict among the decisions on the question, the majority hold (as we have held in a number of cases) that the source of authority for making special assessments is the power to tax. The legislature may adopt any reasonable rule for apportioning the assessments, such as according to benefits, area, front footage, market value, etc., if the effect is not to deprive one of his property without due process of law.

If the rule adopted is "assessment according to benefits," as here, then the levy against each individual tract must not (in theory at least) exceed the benefits that tract will receive from the construction contemplated, and may be burdened only with its proportionate part of the total levy or cost. After the benefits which will accrue to each tract of land have been fixed, and the cost of the improvements has been determined, the apportionment becomes a mere matter of calculation. This procedure, it is agreed, was followed by the district authorities and accordingly a levy for construction was charged against each tract of agricultural land, whether cultivated or not, according to the benefits that it would receive from the construction of the adopted plan of improvement. We quote on this question from Stuart v. Palmer, 74 N.Y. 183, 30 Am.Rep. 289, often referred to as authority:

"I am of opinion that the Constitution sanctions no law imposing such an assessment, without a notice to, and a hearing or an opportunity of a hearing by the owners of the property to be assessed. It is not enough that the owners may by chance have notice, or that they may as a matter of favor have a hearing. The law must require notice to them, and give them the right to a hearing and an opportunity to be heard. It matters not upon the question of the constitutionality of such a law that the assessment has, in fact, been fairly apportioned. The constitutional validity of law is to be tested, not by what has been done under it, but by what may, by its authority, be done. * * *

"It is not disputed that the Legislature has unlimited power (except as restrained by the Federal Constitution) to impose taxes and assessments for public purposes. * * *

"It may cause or authorize local improvements to be made and authorize the expense thereof to be assessed upon the land benefited thereby. But in all cases there must be apportionment of the burdens,

either among all the property-owners of the State, or of the local division of the State, or the property-owners specially benefited by the improvements. In either case, if one is required to pay more than his share, he receives no corresponding benefit for the excess, and that may properly be styled extortion or confiscation. A tax or assessment upon property arbitrarily imposed, without reference to some system of just apportionment, could not be upheld."

See, also, In re Proposed Middle Rio Grande Conservancy Dist., 31 N.M. 188, 242 P. 683; Gutierrez v. Middle Rio Grande Conservancy Dist., 34 N.M. 346, 282 P. 1, 70 A.L.R. 1261; King v. Portland, 38 Or. 402, 63 P. 2, 55 L.R.A. 812; Page & Jones, "Taxation by Assessment", § 118; 25 R.C.L. "Special or Local Assessments," § 48. The phrase "assessment according to benefits" could mean nothing else.

The appellees argue, as a ground for sustaining the constitutionality of the Act, that the legislative classification of agricultural lands into cultivated and uncultivated lands is reasonable. This probably is true, and might justify a different rule for determining the benefits as to that class of land. But the object of the classification was not to determine the benefits but to segregate it and relieve it from paying the greater part of the debt apportioned to it. This cannot be done consistently with the Fourteenth Amendment to the Constitution of the United States. If this can be done then the legislature may by such ingenious legislation relieve land of all its burdens.

If it can extend the time of payment fifteen years, it could extend it fifty years without interest.

We do not hold that the legislature cannot itself, or through a representative, reassess the property for benefits, and correct any injustice that may have been done in the original assessment. Earle Road Imp. Dist. v. Johnson, 145 Ark. 438, 224 S.W. 965; State v. Knott, 129 Fla. 136, 176 So. 113; Everglades Drain. Dist. v. Florida, etc., Corp., 5 Cir., 74 F.2d 914; French v. Barber Asphalt P. Co., 181 U.S. 324, 21 S.Ct. 625, 45 L.Ed. 879; In re Com'rs of Elizabeth, 49 N.J.L. 488, 10 A. 363; Page & Jones on Taxation by Assessment, § 960. The question is not presented and not decided.

The appellant argues that in all cases calling for assessment of benefits for the construction of municipal improvements, there is a contract between the municipality and the property owner, the obligation of which would be impaired by any change authorized by the legislature. The California courts so hold, Los Angeles County v. Rockhold, 3 Cal.2d 192, 44 P.2d 340, 100 A.L.R. 149; San Diego County v. Childs, 217 Cal. 109, 17 P.2d 734; Hershey v. Cole, 130 Cal.App. 683, 20 P.2d 972; Mulcahy v. Baldwin, 216 Cal. 517, 15 P.2d 738; Golden Gate, etc., Dist. v. Filmer, 217 Cal. 754, 21 P.2d 112, 91 A.L.R. 1; Merchants' Nat'l Bank v. Escondido Irr. Dist., 144 Cal. 329, 77 P. 937; O'Farrell v. Sonoma County, 189 Cal. 343, 208 P. 117.

It was argued in Los Angeles County v. Rockhold, supra, that the California doc-

trine was against the great weight of authority and should be abandoned; that such assessments are levied in the exercise of the sovereign power of taxation, and the obligation to pay it arises by law and not by consent. The Supreme Court of California said [3 Cal.2d 192, 44 P.2d 346, 100 A.L.R. 149]: "The identical argument was made in the Childs Case, and we there reaffirmed the doctrine, declaring it to be the established law of this state and a rule of property. The contract theory *having become a rule of property,* we are not disposed to overrule it at this late date. It is therefore unnecessary to discuss in detail petitioner's argument in this connection." (Emphasis ours.)

We agree with appellees that the contract doctrine of the California court is against the weight of authority. Houck v. Little River Drain. Dist., 248 Mo. 373, 154 S.W. 739, and the same case on appeal, 239 U.S. 254, 36 S.Ct. 58, 60 L.Ed. 266; Colby v. City of Medford, 85 Or. 485, 167 P. 487; Everglades Drain. Dist. v. Florida, etc. Corp., supra; Memphis & Charleston R. Co. v. Pace, 282 U.S. 241, 51 S.Ct. 108, 75 L.Ed. 315, 72 A.L.R. 1096; Earle Road Imp. Dist. v. Johnson, supra; State v. Knott, supra; Annotation, 100 A.L.R. 164.

But if the law provides an option which may be accepted by the land owner, upon conditions that amount to the giving and accepting of a consideration, the result may be a contract, the obligations of which are beyond the power of the legislature to change or impair.

The Conservancy Act provides for the payment of the construction assessments in cash; but as a conditional option to the land owner it is provided:

"Failure to pay the whole construction fund assessment within said period of sixty (60) days shall be conclusively considered and held an election on the part of all persons interested, whether under disability or otherwise, to pay such assessment in installments as hereinafter provided. All persons so electing to pay in installments, shall be conclusively held and considered as consenting to said Official Plan and all work thereunder, the issuance of bonds, and the payment of interest thereon; and such election shall be conclusively held and considered as a waiver of any and all right to question the power or jurisdiction of the district to construct the works set forth in said Official Plan, the regularity or sufficiency of the proceedings, or the validity or the correctness of such assessment; * * *.

"In case of such election to pay in installments, the construction fund assessment shall be payable in not more than forty (40) annual installments of principal, the first of which installments shall be payable in five years and the last in not more than forty-five (45) years * * *." L.1927, Ch. 45, § 505.

The Act provided that assessment for construction should bear not more than eight percent interest per annum, all "as may be determined by the board by resolu-

tion." The interest rate was fixed at five and a half percent per annum.

Was there a contract between the district and the land owners who assented to payment of the construction assessment in installments, as contemplated by the contract clause of the Federal Constitution?

The assessment was payable within sixty days after its levy. The statute does not provide unconditionally for the alternative method of payment. It is an offer by the district to the land owners to permit payment in not more than forty annual installments, *the first to be paid in five years, provided* the land owner would consent, (1) to the original plan and the work done thereunder; (2) to the bond issue and the payment of interest thereon; (3) waive all questions of the power of the district to do the work according to the original plan and the regularity of the proceedings, and, (4) waive all right to question the validity or correctness of the assessment.

We are of the opinion that the land owners' waiver of the right to question the correctness of the assessment, and his agreement to pay interest thereon, was a sufficient consideration for the district to accept payments in installments. There would have been a different question had the alternative method of payment been unconditional.

The exact question was before the Supreme Court of Oregon in Colby v. Medford, supra. The facts were as follows:

The City of Medford made improvements, assessed against the benefited property approximating a million dollars. Most of the property owners made application to pay their assessments in ten annual installments, and the city issued bonds in anticipation of the collection of the assessments. Property owners were offered the privilege of paying in ten installments, upon the condition that they would waive all irregularities or defects in the assessment proceedings and apportionment of the cost, which many accepted. The city charter was amended after the assessments had been made and the bonds issued, by which it was provided that the assessments and interest unpaid after a specified date should constitute an unpaid balance, which with interest at the bond rate, should be paid in thirteen years; one-tenth of the principal to be paid annually, beginning with the fourth year. In holding the charter amendment unconstitutional the Oregon Court said [85 Or. 485, 167 P. 499]:

"The city agrees to permit the owner to pay his assessment in installments in consideration of the waiver; the owner agrees to waive irregularities and defects in consideration of the privilege of paying in installments; each party gives and each receives a consideration; and in the end the parties have made a contract. The obligation of the city is to permit the owner to pay in installments in the amounts and at the times prescribed by the Bancroft bonding act, and the obligation of the owner is to pay at the times and in the amounts specified. The city cannot, by amendment to its charter, change the terms of the contract without the consent of the owner. The Hanson plan attempts to change the contract made between the city and owner by changing the

number and amount of the unpaid installments and extending the time over a period of 13 years. The right of the city to change the very substance of its contract does not depend upon whether the change is advantageous to the owner, but it is dependent upon the consent of the owner; and hence it is beside the mark to say that the change is for the benefit of the owner. The Hanson plan is not merely permissive; it does not enable the owner to choose for himself, but its avowed purpose is to embrace all unpaid assessments by the compelling force of law; and therefore the Hanson plan is unlawful to the extent that it attempts to change the contracts which it made under the Bancroft bonding act and also those made under the charter concerning water main assessments."

The Oregon court cited and followed the Colby case in later decisions, in which the same question was an issue.

■ The Relief Act offends the due process, the equal protection, and the contract clauses of the United States Constitution, and is therefore void. It is none the less void if, as the legislature found, the object and effect of the Act if followed would benefit all the lands of the district. The parties to the contract might decide otherwise.

The decree of the district court is reversed and cause remanded with instructions to enter a decree for appellant.

It is so ordered.

ZINN, SADLER, MABRY, and BICKLEY, JJ., concur.