[Civ. No. 10685.   Third Dist.   May 28, 1963.]

STATE SCHOOL BUILDING FINANCE COMMITTEE, Petitioner, v. BERT A. BETTS, as State Treasurer, Respondent.

Stanley Mosk, Attorney General, E. G. Funke, Assistant Attorney General, and V. Barlow Goff, Deputy Attorney General, for Petitioner.

Orrick, Dahlquist, Herrington & Sutcliffe for Respondent.

FRIEDMAN, J.—Petitioner seeks a writ of mandate to compel respondent State Treasurer to prepare and sell $20,-000,000 in bonds as directed by a resolution of the State School Building Finance Committee acting pursuant to the State School Building Aid Bond Law of 1952 (now Ed. Code, §§ 19701-19715).

At its Second Extraordinary Session of 1952, the Legislature considered and acted upon a group of related enactments designed to raise and distribute funds for the building programs of local school districts. As adopted, these were:

First, an appropriation of $20,000,000 from the state General Fund for school building aid apportionments (Stats. 1953, 2d Ex.Sess. 1952, ch. 26). While effective as an urgency measure on September 4, 1952, it was to become operative only upon adoption of another statute, the State School Building Aid Law of 1952.

Second, Assembly Constitutional Amendment No. 3, which was later approved by the voters at the election of November

4, 1952, and became section 16.5 of article XVI of the state Constitution. It authorized a state bond issue of $185,000,-000 for the general purpose of providing loans and grants to school districts and for the following subsidiary purpose:

"(c) To repay, as provided by law, the money appropriated from the General Fund at the 1952 Second Extraordinary Session for state school building aid."[1]

Third, the State School Building Aid Law of 1952 (now Ed. Code §§ 19551-19689) governing capital aid apportionments to school districts.[2] This enactment became effective as an

---

[1]Ten years later, in 1962, numerous state bond authorizations which had found their way into the Constitution, among them section 16.5 of article XVI, were repealed but continued in effect as statutes (Assembly Constitutional Amendment No. 12, Stats. 1961, Res., ch. 221). As adopted in 1952, section 16.5 read as follows:

"Bonds of the State of California shall be prepared, issued, and sold in the amount of one hundred eighty-five million dollars ($185,000,000), in such denominations, to be numbered, to bear such dates, and to bear such rate of interest as shall be determined by the Legislature.

"The proceeds of such bonds shall be used:

"(a) To provide loans and grants to the several school districts of the State, subject to such legislation, rules, or regulations as the Legislature may, from time to time determine.

"(b) To pay the expenses that may be incurred in preparing, advertising, issuing, and selling the bonds, and in administering and directing the expenditure of the moneys realized from the sale of such bonds.

"(c) To repay, as provided by law, the money appropriated from the General Fund at the 1952 Second Extraordinary Session for state school building aid.

"The issuance, signing, countersigning, endorsing, and selling of the bonds herein provided for, and the interest coupons thereon, the place and method of payment of principal and interest thereon, the procedure for initiating, advertising and holding sales thereof, and the performance by the several state boards and state officers of their respective duties in connection therewith; and all other provisions, terms, and conditions relating to the bonds, shall be as provided by the Legislature.

"The Legislature shall pass all laws, general or special, necessary or convenient to carry into effect the provisions of this section. Such laws may provide for the allocation of funds to school districts pursuant to this section by the State Allocations Board or a similar agency, and in that event, notwithstanding any other provision of this Constitution, Members of the Legislature who are required to meet with such board shall have equal rights and duties with the nonlegislative members to vote and act upon matters pending before such board.

"The Legislature shall require each district receiving an allocation of money from the sale of bonds pursuant to this section to repay such money to the State on such terms and in such amounts as may be within the ability of the district to repay.

"The people of the State of California in adoping this section hereby declare that it is in the interests of the State and of the people thereof for the State to aid school districts of the State in providing necessary and adequate school sites and buildings for the pupils of the Public School System, such system being a matter of general concern inasmuch as the education of the children of the State is an obligation and function of the State."

[2]Throughout this opinion we shall refer to Education Code sections by the revised numbering employed in the Education Code recodification of

urgency measure on November 12, 1952, thereby making the $20,000,000 appropriation operative.

Fourth, the State School Building Aid Bond Law of 1952 (now Ed. Code §§ 19701-19715), providing for the issue and sale of the bonds authorized by article XVI, section 16.5, under direction of the State School Building Finance Committee (petitioner in the present action). This enactment too became effective as an urgency measure on November 12, 1952. One of its provisions was section 19710 of the Education Code, which directed progressive sale of bonds up to an aggregate of $165,000,000 for apportionment to school districts, and then declared: "The remainder of the bonds, or so many thereof as may be necessary shall be issued and sold as provided in Section 19711." The latter section is set forth below.[3]

The $20,000,000 General Fund appropriation was apparently advanced to the school building aid program and duly distributed to school districts. An aggregate of $165,000,000 in bonds was sold under the authority of article XVI, section 16.5, the proceeds being used for apportionment to school districts. As regards the repayment of all or part of the General Fund advance pursuant to the formula in Education Code section 19711 (footnote 3, *supra*), the State Director of Finance determined in 1956 that the 1953 General Fund surplus was not under $5,000,000; that indeed the fund enjoyed at that time a surplus exceeding $88,000,000. Accordingly, no action was taken to sell the remaining bonds for the purpose of repaying the 1952 General Fund advance.

In 1958 the Legislature took occasion to reexamine the $20,000,000 General Fund advance authorized in 1952. Apparently believing that the future condition of the General Fund might warrant repayment, it adopted a new formula, now set forth in Education Code section 19712. On its face the new statute authorized sale of the remaining $20,000,000 in school building aid bonds authorized by article XVI, sec-

---

1959 (Stats. 1959, ch. 2) and without reference to the original numbering employed in 1952.

[3]Education Code section 19711:

"The Director of Finance shall define and determine the surplus which exists in the General Fund as of June 30, 1953. If the estimated surplus so determined is less than five million dollars ($5,000,000), the School Building Finance Committee shall issue and sell sufficient bonds, in an amount to the nearest one thousand dollars ($1,000) but not in excess of twenty million dollars ($20,000,000), to provide a surplus of five million dollars ($5,000,000) in the General Fund, and the proceeds of the bonds —so issued and sold shall be deposited in the General Fund."

tion 16.5 and use of the proceeds to reimburse the General Fund whenever the Director of Finance determined that ''in his opinion such action is necessary to meet the needs of the General Fund. . . .''[4]

Almost five years later, on February 27, 1963, the Director of Finance made the determination of General Fund need specified in section 19712. He requested petitioner, the State School Building Finance Committee, to proceed with the sale of $20,000,000 in bonds for the purpose of repaying the General Fund. The committee then met and adopted a resolution prescribing the bond details and directing bond preparation and sale by respondent State Treasurer. The latter has refused to act. He has filed a general demurrer and supporting brief in response to the petition for writ of mandate.

A principal thesis advanced by respondent's counsel is the collective character of the constitutional and statutory arrangements adopted by the voters and the Legislature in 1952; these include subdivision (c) of article XVI, section 16.5, permitting $20,000,000 of bond money to be used for General Fund reimbursement only ''as provided by law,'' that is, as provided by law in 1952; that the ''law'' referred to was Education Code section 19711, which permitted sale of bonds for repayment of the General Fund only if the latter had a 1953 surplus under $5,000,000; that, since such a condition did not occur in 1953, the permission expired by force of its own limitation; that these 1952 provisions collectively constituted a contract between the state and the bondholders; that the state cannot constitutionally impair the obligations of this contract (U.S. Const., art. I, § 10; Cal. Const., art. I, § 16); that, if implemented, the 1958 attempt (Ed. Code, § 19712) to set up a new condition for sale of the additional

---

[4]Education Code section 19712 provides:
''Notwithstanding the provisions of Section 19711, upon order of the Director of Finance, made when in his opinion such action is necessary to meet the needs of the General Fund, the State School Building Finance Committee shall issue and sell bonds in the amount of twenty million dollars ($20,000,000) authorized by Article XVI, Section 16.5 of the Constitution. Proceeds of such bonds shall be used to repay the money appropriated from the General Fund at the 1952 Second Extraordinary Session for state school building aid, and shall be deposited in the General Fund.

''The Legislature hereby declares that it has authority by virtue of Section 16.5 of Article XVI of the Constitution to authorize the sale of bonds referred to in the preceding paragraph irrespective of the adoption of the constitutional amendment of the 1958 First Extraordinary Session of the Legislature adding Section 19 to Article XVI of the Constitution, which confirms such authority.''

$20,000,000 in bonds will impair the obligations of the contract.

To know the obligations of a contract we look to the laws in force at its making. (*W. B. Worthen Co.* v. *Kavanaugh,* 295 U.S. 56, 60 [55 S.Ct. 555, 79 L.Ed. 1298, 97 A.L.R. 905]; *Islais Co., Ltd.* v. *Matheson,* 3 Cal.2d 657, 662 [45 P.2d 326].) The laws under which public bonds are issued become a part of the contract between the bondholders and the issuing authority, and no change in these laws may be permitted to impair the bond obligation. (*Sutter Basin Corp.* v. *Brown,* 40 Cal.2d 235, 241 [253 P.2d 649], cert. den. 346 U.S. 855 [74 S.Ct. 71, 98 L.Ed. 369]; *County of San Bernardino* v. *Way,* 18 Cal.2d 647, 661 [117 P.2d 354]; *Golden Gate Bridge etc. Dist.* v. *Filmer,* 217 Cal. 754, 757 [21 P.2d 112, 91 A.L.R. 1]; see *May* v. *Board of Directors,* 34 Cal.2d 125, 129 [208 P.2d 661]; 12 Am.Jur., Constitutional Law, § 399; 43 Am.Jur., Public Securities and Obligations, § 9.)

The bar against impairment does not calcify the bond law beyond all possibility of amendment. The contract obligation is not impaired unless the alteration in the law deprives the bondholders of a substantial right or remedy. If, despite a change in the law, the bondholders may enforce their rights no less effectually than before; if there has been no encroachment upon *valuable* contractual rights, then the obligations of the contract have not been impaired. (*United States* ex. rel. *Von Hoffman* v. *City of Quincy,* 4 Wall (71 U.S.) 535, 553-554 [18 L.Ed. 403]; *County of San Bernardino* v. *Way, supra,* 18 Cal.2d at 661-663; see *Metropolitan Water Dist.* v. *Toll,* 1 Cal.2d 421 [35 P.2d 519]; 12 Am.Jur., Constitutional Law, § 402.)

The bondholders whose contract is involved here are the purchasers of the $165,000,000 in school building aid bonds thus far sold under the 1952 authorization. Respondent does not specify just what injury they will suffer. Sale of the remaining $20,000,000 in bonds will neither affect their enforcement remedies, alter the time or method of payment, nor deprive them of security. (Compare, *Sutter Basin Corp.* v. *Brown, supra,* 40 Cal.2d 235; *Shouse* v. *Quinley,* 3 Cal.2d 357 [45 P.2d 701]; *County of Los Angeles* v. *Rockhold,* 3 Cal.2d 192 [44 P.2d 340, 100 A.L.R. 149]; *St. Louis Union Trust Co.* v. *Franklin American Trust Co.,* 52 F.2d 431 [87 A.L.R. 386].) Value of their investment will be diminished by not so much as a peppercorn. They will suffer no more harm than that flowing from new and unrelated state bond

issues, of which there have been a number in the past decade. ▇ Buyers of state general obligation bonds bank on the state's credit. The point at which the state's credit sags under fresh bond sales may be the subject of political and economic debate. It triggers no constitutional injury.

Respondent argues that the present bondholders "relied" upon Education Code section 19710, which limited the bond sale to $165,000,000 for school aid purposes; that they "knew" of the restrictions fixed by section 19711 upon sale of additional bonds to repay the General Fund. Fallacy of the argument becomes apparent when it is stated in reverse, i.e., that the state entered into a contract *not* to issue the additional $20,000,000 in bonds except as permitted by section 19711. One scans the group of 1952 enactments in vain for some such restriction or commitment. ▇ Article XVI, section 16.5, did not limit the bond issue to $165,000,000. It directed the sale of $185,000,000 in bonds, permitting use of the proceeds not only for the school aid program but also to repay the General Fund "as provided by law." In proposing the constitutional amendment, the 1952 Legislature doubtless "had in mind" the conditions for General Fund repayment specified by the pending legislation which became Education Code section 19711. If it had any purpose to create a fixed contractual situation, effectually preventing future Legislatures from altering the conditions of General Fund reimbursement, it employed no language suggestive of that intent. Instead, it used the phrase "as provided by law." ▇ Incorporation by reference of the law generally on a particular subject includes not only the contemporary law but future amendments. (*Palermo* v. *Stockton Theatres, Inc.*, 32 Cal.2d 53, 59 [195 P.2d 1]; Annotation, *Effect of modification or repeal of constitutional or statutory provision adopted by reference in another provision*, 168 A.L.R. 627, 632-633; compare, *Rancho Santa Anita, Inc.* v. *City of Arcadia*, 20 Cal.2d 319, 322 [125 P.2d 475].) ▇ Constitutional language will not be construed as a limitation on legislative power in the absence of a clearly stated restriction. (*Dean* v. *Kuchel*, 37 Cal.2d 97, 100 [230 P.2d 811].) ▇ In adopting the constitutional amendment, the voters authorized repayment of the General Fund advance under conditions just as flexible as those necessarily implied in the phrase "as provided by law."

Under these circumstances a change in the law raising bond limits or permitting additional bond issuance violates no con-

tract. (See *Rowekamp* v. *Mercantile-Commerce Bank & Trust Co.*, 72 F.2d 852; *Harsha* v. *City of Detroit*, 261 Mich. 586 [246 N.W. 849 , 90 A.L.R. 853]; see also 43 Am.Jur., Public Securities and Obligations, § 275, p. 487; Annotation, *Subsequent issue of bonds by public body as impairing obligation to prior creditors*, 87 A.L.R. 397.) Not only is there no substantial injury amounting to impairment, there is not even a contract which limits issue of the $20,000,000 in unsold bonds.

Counsel for respondent point not only to a contract between state and bondholders; they postulate a contract between the 1952 Legislature and the electors which, they say, is beyond modification by the 1958 or any other Legislature. Indeed, there are California authorities indicating that, while electoral approval of a bond proposition may fall short of a true contract, it nevertheless creates a "status analogous to such [contractual] relation" with the electors, whose conditions and assurances may not be altered by amendatory legislation. (*Peery* v. *City of Los Angeles*, 187 Cal. 753, 767-769 [203 P. 992, 19 A.L.R. 1044]; see also *O'Farrell* v. *County of Sonoma*, 189 Cal. 343, 348 [208 P. 117]; *County of Alameda* v. *Garrison*, 108 Cal.App. 122, 126 [291 P. 464].) It is not necessary to draw contractual analogies. The logical basis for invalidating such amendments is not that they violate a metaphorical contract; rather, that they clash with the constitutional provision which required popular approval of the bonds in the first place, or, as in this case, the constitutional authority for the bond issue. Even if such an analogy were drawn here, the contractual commitment between Legislature and voters is no more fixed than that between state and bondholders. ■ Neither prevents issue of $20,000,000 in bonds for repayment of the General Fund under whatever conditions the law may provide, that repayment being precisely what article XVI, section 16.5 authorized.

■ Some point is made of the last paragraph of Education Code section 19712, which refers to article XVI, section 19 of the state Constitution as a confirmation of legislative authority to amend the conditions of General Fund repayment. Actually, section 19 contained no such authority. At the time section 19712 was before the Legislature, the same session was considering Senate Constitutional Amendment No. 1, a new school bond proposal later approved by the people as article XVI, section 19 of the Constitution.[5] In

[5]Section 19 of article XVI was approved by the electors in November 1958. Like section 16.5, it was repealed in 1962 but continued in force as a statute.

the pending constitutional amendment was a clause expressly asserting legislative authority to sell the remaining 1952 bonds for repayment of the $20,000,000 General Fund advance. That clause was deleted while the constitutional proposal was still before the Legislature. Thus the reference in section 19712 is a dead letter. Respondent refers to this part of section 19712 as an "admission" by the Legislature that it lacked other authority. It was hardly an admission because the same paragraph of section 19712 bravely asserts independent existence of the same authority. Whether the 1958 Legislature was whistling in the dark or crying wolf, it was entitled to reckon with constitutional uncertainties. We find no invalidity in section 19712.

Finally, respondent contends that authority for sale of additional bonds has ceased, because of lapse of an unreasonable time and changed circumstances since 1952. In this connection counsel have cited a number of out-of-state cases, all dealing with bond issues of municipalities and local districts. Apparently there is no California decision in point. Suffice it to say that one court has nullified an attempt to issue bonds 11 years after authorization, but others have permitted delays of 9, 10, 11, and even 19 years. (15 McQuillin, Municipal Corporations (3d ed.) § 43.49.) These decisions do not rest on mere lapse of time, but rather upon changed conditions which make delay unreasonable. On the assumption that such an approach might be applied to a state bond issue authorized by constitutional amendment, and assuming for a brief moment that California courts might want to supervise fiscal agencies in timing bond sales, we hold that no unreasonable delay or change of conditions occurred here. The Legislature was entitled to determine when and under what conditions the General Fund might need repayment of the $20,000,000 advanced in 1952. In the absence of fixed contractual commitments or specific constitutional limitations, the 1952 Legislature could not limit the power of its successors to determine or redetermine the conditions which might warrant sale of the remaining $20,000,000 in bonds for that purpose. (See *In re Collie*, 38 Cal.2d 396, 398 [240 P.2d 275].)

Respondent's demurrer is overruled. The court will issue a peremptory writ as prayed.

Pierce, P. J., and Schottky, J., concurred.