[Civ. No. 13851. Third Dist. Jan. 11, 1974.]

VETERANS OF FOREIGN WARS OF THE UNITED STATES et al.,
Plaintiffs and Appellants, v.
THE STATE OF CALIFORNIA et al., Defendants and Respondents.

**COUNSEL**

Floyd V. Gibbert for Plaintiffs and Appellants.

Evelle J. Younger, Attorney General, Iver E. Skjeie, Assistant Attorney General, and James M. Sanderson, Deputy Attorney General, for Defendants and Respondents.

**OPINION**

**FRIEDMAN, Acting P. J.**—Alleging an illegal diversion of money from the Veterans' Farm and Home Building Fund of 1943 in the state treasury,

plaintiff Veterans of Foreign Wars seeks an injunction against further diversions and a judgment directing the fund's reimbursement. The trial court denied relief and plaintiff appeals.

In 1943 the Legislature adopted the Veterans Farm and Home Purchase Act of 1943, establishing for California war veterans a farm and home finance purchase program comparable to that which the state had conducted for World War I veterans. The 1943 act was codified as article 3 of chapter 6, division 4, of the Military and Veterans Code, commencing with section 984. (All our statutory references, unless otherwise noted, will be to the Military and Veterans Code.) The 1943 Legislature also adopted statutes establishing in the state treasury "a revolving fund known as the Veterans' Farm and Home Building Fund of 1943" (§ 988);[1] calling for deposit of payments made by farm and home purchasers into the fund (§ 988.1); permitting outlays from the fund for financing taxes, insurance and repairs on farm and home properties (§ 988.2) and authorizing advances for administrative expenses (§ 988.3).

To provide capital funds for the program, the 1943 Legislature proposed a $30,000,000 general obligation bond issue for submission to the voters in 1944. The bond proposition took the form of a proposed law, the Veterans Bond Act of 1943, comprising article 4 of the same chapter of the Military and Veterans Code. The initial provision (§ 990.1) authorized a state debt to be created "For the purpose of creating a fund to provide farm and home aid for veterans . . . ." Another provision was section 990.5, annually appropriating from the General Fund in the State Treasury enough money to pay installments of bond principal and interest, the general fund to be reimbursed out of the Building Fund of 1943. Section 990.8 required, in essence, the deposit of bond sales proceeds in the Veterans' Farm and Home Building Fund of 1943, to be used exclusively for the farm and home aid program. Section 990.9 authorized the temporary investment of surplus money in the Farm and Home Building Fund, interest earnings being credited to the same fund.

At the general election of 1944 the voters ratified these proposed statutes, thus authorizing the bond issue. At later statewide elections between 1946 and 1972 the Legislature submitted and the voters approved 10 additional bond issues for the veterans farm and home purchase pro--

---

[1]Military and Veterans Code section 988 provides: "There is in the State Treasury a revolving fund known as the Veterans' Farm and Home Building Fund of 1943. All moneys deposited in such fund shall be subject to the provisions of this article. Money may be withdrawn from such fund in accordance with law upon requisition of the department."

gram, each issue ranging between $100 and $500 million. All these bond proposals designated the Veterans' Farm and Home Building Fund of 1943 as the repository of the bond proceeds.

This case was submitted to the trial court on a stipulation of facts. Beginning in the fiscal year 1965-1966, according to the stipulation, the Legislature has appropriated $500,000 annually from the Veterans' Farm and Home Building Fund of 1943 for the purpose of defraying county expenses of maintaining county veterans' service offices.[2] ■ Plaintiff contends that the annual appropriation is inconsistent with the purpose of the successive veterans bond acts and violates article XVI, section 1, of the state Constitution. We uphold this contention.

■ Generally, the law under which public bonds are issued forms a contract between the issuing authority and the bondholders which may not be impaired by subsequent legislation. (*Sutter Basin Corp.* v. *Brown,* 40 Cal.2d 235, 241 [253 P.2d 649]; *County of San Bernardino* v. *Way,* 18 Cal.2d 647, 661 [117 P.2d 354].) The voters as well as the bondholders have an interest in the continued integrity of voter-ratified bond proposals. Some courts analogize the terms of a voter-approved bond issue to a contract between the issuing authority and the voters. (*Golden Gate Bridge etc. Dist.* v. *Filmer,* 217 Cal. 754, 757 [21 P.2d 112, 91 A.L.R. 1]; *Peery* v. *City of Los Angeles,* 187 Cal. 753, 767-769 [203 P. 992, 19 A.L.R. 1044].) In *State School Bldg. Fin. Com.* v. *Betts,* 216 Cal.App.2d 685, 693 [31 Cal.Rptr. 258], this court observed: "It is not necessary to draw contractual analogies. The logical basis for invalidating [later] amendments is not that they violate a metaphorical contract; rather, that they clash with the constitutional provision which required popular approval of the bonds in the first place . . . ." The notion advanced by us in *Betts* has received approval in decisions of other courts. (See *City of Santa Clara* v. *Von Raesfeld,* 3 Cal.3d 239, 249 [90 Cal.Rptr. 8, 474 P.2d 976]; *Eastern Mun. Water Dist.* v. *Scott,* 1 Cal.App.3d 129, 135 [81 Cal.Rptr. 510].)

In proposing the Veterans Bond Act of 1943 for electoral approval, the Legislature acted under article XVI, section 1, of the state Constitution.

---

[2]An example of the series of appropriations under attack is Item 154 of the Budget Act of 1971 (Stats. 1971, ch. 266, p. 457): "For contribution to counties toward the compensation and expenses of county service officers, Department of Veterans Affairs, to be expended in accordance with Section 972 of the Military and Veterans Code, payable from the surplus of the Veterans' Farm and Home Building Fund of 1943—$500,000."

Section 972, Military and Veterans Code, authorizes counties to maintain veterans' service offices and permits the State Department of Veterans Affairs to supply a portion of the operating expenses of these offices "out of state moneys available therefor . . . ."

That provision authorizes submission to the voters of any law proposing a state general obligation bond issue. It declares that a bonding law ratified by the electors "shall be irrepealable until the principal and interest [of the bonds] shall be paid and discharged, and such law may make provision for a sinking fund to pay the principal of such debt or liability . . . ." It requires that "all moneys raised by authority of such law shall be applied only to the specific object therein stated or to the payment of the debt thereby created."

The constitutional injunction against later repeal of the bond law aims to prevent the Legislature from making substantial changes in the scheme or design which induced voter approval. That injunction has been violated here. The Legislature's annual appropriations of money in the bond-financed fund for a public function unrelated to the bond-financed scheme would impliedly repeal an important feature of the bond law.

As submitted to the voters, each of the bond proposals up through 1958 declared that bond sale proceeds would be paid into the Veterans' Farm and Home Building Fund of 1943 for exclusive use of the veterans' farm and home acquisition program.[3] With the Veterans Bond Act of 1960 (§ 996.75 et seq.), the draftsmanship of the successive bond acts was revised. Nevertheless, each voter-ratified bond law, from the act of 1943 through the act of 1971, has contained a parallel declaration, authorizing creation of a state indebtedness for "the purpose of creating a fund to provide farm and home aid for veterans in accordance with the provisions of the Veterans Farm and Home Purchase Act of 1943 and of all acts amendatory thereof or supplemental thereto . . . ."[4]

By referring to the provisions "of this chapter" of the Military and Veterans Code, as well as the Veterans Farm and Home Purchase Act of 1943 and "all acts amendatory thereof and supplemental thereto," each successive bond proposal absorbed a series of statutory directions not expressly set forth in the ballot measure. Chief among these was section 988 (fn. 1, *supra*) designating the Veterans' Farm and Home Building

---

[3]For example, section 990.8, included in the 1944 bond proposal, provided in part: "The proceeds of the sale of such bonds and such amount as may have been paid as accrued interest thereon shall be forthwith paid over by said Treasurer into the Veterans' Farm and Home Building Fund of 1943 and must be used exclusively in aiding veterans in the acquisition of, or payments for, farms and homes, in accordance with the provisions . . . of this chapter; provided, that the proceeds from the sale of said bonds may be used to pay the debt created by the issuance and sale thereof."

Counterpart provisions in later bond acts up through 1958 appear as Military and Veterans Code sections 993.8, 995.08, 996.06, 996.31, 996.51 and 996.66.

[4]See sections 990.1, 993.1, 995.02, 996.01, 996.26, 996.46, 996.61, 996.78, 996.90, 996.974, 996.988.

Fund of 1943 as a "revolving fund." This designation necessarily implied use and re-use of bond proceeds and increments. Money would be invested in the farm and home acquisition act program and, as it returned in the form of veterans' payments of principal and interest, would be reinvested in the program.

Thus each bond proposition imposed a commitment on the 1943 building fund—for financing the veterans' farm and home purchase program, for its administration, for the temporary investment of surplus funds and for transfer to the General Fund to defray bond service costs. The revolving fund concept extended the commitment beyond the original proceeds of bond sales, embracing all increments.[5] Such was the tenor of the composite of bonding laws approved by the voters at successive bond elections. According to article XVI, section 1, of the state Constitution, these laws became "irrepealable" as long as veterans bonds were outstanding.

■ "When a later statute supersedes or substantially modifies an earlier law but without expressly referring to it, the earlier law is repealed or partially repealed by implication. . . . [Repeals by implication] will occur only where the two acts are so inconsistent that there is no possibility of concurrent operation, or where the later provision gives undebatable evidence of an intent to supersede the earlier . . . ." (*Sacramento Newspaper Guild* v. *Sacramento County Bd. of Suprs.,* 263 Cal.App.2d 41, 54 [69 Cal.Rptr. 480].)

■ When part of a fund wholly commited by statute is later appropriated to an alien purpose, the appropriation necessarily causes a partial repeal by implication. The repeal occurs because the fund cannot finance the later appropriation without violating part of its earlier commitment. The two laws simply cannot operate concurrently and completely. One must give way.

■ The maintenance of county veterans' service offices is a function alien to the veterans' farm and home acquisition program. The parties' stipulation of facts does not describe the functions of the county offices, let alone reveal a tangible nexus with the farm and home financing program. County veterans' service officers support local welfare claims of indigent veterans, assist them and their families in pursuit of federal benefits and arrange for burials. (§§ 970-971.) We know judicially[6] that the

---

[5]The Veterans Farm and Home Purchase Act of 1943 appropriated $2,000,000 from the general fund as an advance against future bond sales. (Stats. 1943, ch. 1046, § 2, p. 2987.) The Attorney General makes no claim that any of this advance remains in the Farm and Home Building Fund.

[6]See Evidence Code section 452, subdivisions (c) and (h).

Division of Farm and Home Purchases of the State Department of Veterans Affairs maintains local offices in various parts of the state, equipped to receive and process veterans' applications for farm and home financing. Although the record is entirely silent on this score, it is possible that county service offices receive inquiries which they refer to the nearest office of the Division of Farm and Home Purchases. With that negligible exception, no relationship between the veterans' farm and home program and the county veteran service offices is apparent. The Building Fund of 1943 is wholly committed to the former purpose by the successive bond laws. Use of part of the fund for the latter purpose is an implied, partial repeal of the bond laws.

■ The Attorney General contends that the annual $500,000 appropriation affects not bond proceeds, but only money derived from repayments by veterans in excess of bond requirements; that such money is "surplus"; that it is "created by statute" and that its use may be modified by statute. The argument would be more persuasive (although hardly compelling) were the problem only one of bond impairment. According to financial statements attached to the stipulation of facts, the Veterans' Farm and Home Building Fund of 1943 has had a substantial surplus over bond service requirements during the seven fiscal years commencing July 1, 1963, and an excess of revenue over expenditures even after deduction of the annual $500,000 appropriation.

If later legislation does not encroach upon valuable rights, the bondholders' contract has not been impaired. (*City of Santa Clara* v. *Von Raesfeld, supra,* 3 Cal.3d at p. 250.) Bonds issued under the various veteran bond acts are general obligation bonds, payable from the state's General Fund. The Veterans' Farm and Home Building Fund of 1943 bears many similarities to a sinking fund, designed in part to feed bond redemption money and interest into the General Fund. To an extent we need not decide here, such a fund is immune from statutory diversion to an unrelated purpose. (See *Riley* v. *Johnson,* 6 Cal.2d 529, 532-533 [58 P.2d 631]; *Riley* v. *Johnson,* 219 Cal. 513, 521 [27 P.2d 760, 92 A.L.R. 1292]; *Cross of Malta Building Corp.* v. *Straub* (1970) 257 Ore. 376 [476 P.2d 921].) To call money in the Building Fund of 1943 "surplus," in the sense that it will never be needed to finance bond service costs during decades of bonded indebtedness, requires an economic crystal ball which no one possesses. Yesterday's surplus may be tomorrow's dire need. Although legislative draftsmanship applies the term "surplus" to the source of the $500,000 appropriations, this court, obligated to enforce

the Constitution, views the term as a semantic device, without real meaning.[7]

The state's thesis—that the Legislature may dispose of its own monetary creation—will not stand up. The money may be of statutory derivation; but the statutes have a special character, having been ratified by the voters under article XVI, section 1, of the state Constitution. The fallacy of the state's claim of "surplus" becomes apparent with recognition that the fiscal needs of the veterans' farm and home program have occasioned successive bond issues. Even as this opinion is written, a bill calling for submission of a new $350,000,000 veterans bond issue at the June 1974 statewide election is pending before the 1974 Legislature.[8] The pending proposal bears an urgency clause which declares: "This legislation will increase the funds available to qualified veterans to finance the purchase of a home, farm, or mobilehome. To insure that all qualified veterans will have funds available this act must go into effect immediately."

The Budget Act of 1965 inaugurated a series of nine annual $500,000 appropriations (up through 1973) for the county veterans service offices, all payable out of money otherwise available for the continuation of the veterans' farm and home aid program. During these years new wars have swollen the number of eligible veterans; increased interest rates have swollen the cost of state borrowings. Now, in 1974, pending legislation recites a need to increase the amount of money available for the program's continuation. The aggregate of annual diversions has drained the Veterans' Farm and Home Building Fund of up to $4,500,000. The surplus posited by the state is nonexistent. In reality, the county service offices have not been supported out of surplus of the Farm and Home Building Fund, but out of future state borrowings.

Our disposition of the substantive issue requires reversal of the judgment. After the remand, procedural problems will appear. Plaintiff seeks a judgment for the recovery of past expenditures and an injunction restraining future expenditures, naming as defendants the state, the

---

[7]Relative to the claim of "surplus" money, the parties cite *Daugherty* v. *Riley,* 1 Cal.2d 298 [34 P.2d 1005], and *Urban* v. *Riley,* 21 Cal.2d 232 [131 P.2d 4]. In the former case the court invalidated the Legislature's attempt to divert income of a special regulatory fund for a general state purpose. In the latter, the court sustained a similar diversion of "surplus" of the special fund. These decisions are not in point. Their conceptual basis was the former constitutional prohibition against raising money by special taxation. (Cal. Const. of 1879, art. IV, § 25, cl. 10.) Here we confront quite different constitutional concepts—the inhibition against impairment of the bondholders' contract and the ban on repeal of bond laws during the lifetime of the bonds.

[8]See Assembly Bill No. 2647, which passed the Assembly in September 1973 and presently awaits hearing in a Senate committee.

Governor, the Legislature, the Department and Director of Finance, and officials of the State Department of Veterans Affairs.

Although seeking a judgment restoring past expenditures to the Veterans' Farm and Home Building Fund, plaintiff makes no claim that any of the named defendants is personally liable for repayment of the money; nor does plaintiff specify a fund or appropriation from which a judgment may be paid. A judgment against the state, even when authorized by law, may be paid only out of appropriated funds. (*Westinghouse Elec. Co.* v. *Chambers*, 169 Cal. 131, 135 [145 P. 1025].) The Attorney General correctly points out that the passage of an appropriation law is a legislative act which a court may not command. (*Myers* v. *English*, 9 Cal. 341, 349; *California State Employees' Assn.* v. *State of California*, 32 Cal. App.3d 103, 108-109 [108 Cal.Rptr. 60]; see also, *Santa Clara County* v. *Superior Court*, 33 Cal.2d 552, 557-558 [203 P.2d 1].) The Governor, moreover, acts in a legislative capacity in submitting the annual budget bill to the Legislature and in approving it after its adoption. (Cal. Const., art. IV, §§ 10, 12; see *Jenkins* v. *Knight*, 46 Cal.2d 220, 223 [293 P.2d 6]; *Lukens* v. *Nye*, 156 Cal. 498, 501-503 [105 P. 593].) The Legislature no less than the judicial branch is obligated to adhere to the state Constitution. The Legislature may take cognizance of its unconstitutional depletions of the Veterans' Farm and Home Building Fund.

With respect to restraints upon future diversion, plaintiff has failed to name a defendant who is at least a necessary party. The state Controller has the function of auditing claims and of drawing warrants upon various funds in the state treasury to meet claims authorized by legislative appropriations. (Cal. Const., art. XIII, § 21; Gov. Code, §§ 925.4, 925.6, 925.8, 12410, 12440.) Lawsuits to compel or restrain payment of claims traditionally take the form of mandamus actions against the Controller. (*California Highway Com.* v. *Riley*, 192 Cal. 97, 112 [218 P. 579]; *Board of Osteopathic Examiners* v. *Riley*, 192 Cal. 158, 162 [218 P. 1018]; *Madden* v. *Riley*, 53 Cal.App.2d 814, 820-821 [128 P.2d 602].) After the remand plaintiff may, if so advised, take steps to join the Controller as a defendant.

Judgment reversed.

Regan, J., and Janes, J., concurred.