OFFICE OF THE ATTORNEY GENERAL
State of California

JOHN K. VAN DE KAMP
Attorney General

| | | |
|---|---|---|
| OPINION | : | |
| | : | No. 90-306 |
| of | : | |
| | : | August 21, 1990 |
| JOHN K. VAN DE KAMP | : | |
| Attorney General | : | |
| | : | |
| RODNEY O. LILYQUIST | : | |
| Deputy Attorney General | : | |
| | : | |

THE HONORABLE JACK O'CONNELL, MEMBER, CALIFORNIA ASSEMBLY, has requested an opinion on the following question:

Does the Legislature's limitation upon the number of counties eligible to receive bond funds for youth shelters for abused and neglected children comply with the conditions set forth in the bond act approved by the voters.

CONCLUSION

The Legislature's limitation upon the number of counties eligible to receive bond funds for youth shelters for abused and neglected children complies with the conditions set forth in the bond act approved by the voters.

ANALYSIS

Chapter 264 of the Statutes of 1988, known as the County Correctional Facility Capital Expenditure and Youth Facility Bond Act of 1988 ("bond act"), proposed the addition of sections 4496-4496.48 to the Penal Code. The legislation was submitted to the voters at the November 8, 1988, general election as Proposition 86 for ratification in accordance with the terms of article XVI of the Constitution. The bond act received the requisite electorate approval, authorizing a total bond issue of $500 million with $410 million designated for county correctional facilities, $65 million for county juvenile facilities, $15 million for youth centers, and $10 million for youth shelters. (Pen. Code, § 4496.12.) This opinion is concerned with the disposition of the $10 million for youth shelters.

The California Constitution requires the Legislature to submit for voter approval any law proposing a state general obligation bond issue. Section 1 of article XVI of the Constitution provides:

"The Legislature shall not, in any manner create any debt or debts, liability or liabilities, which shall, singly or in the aggregate with any previous debts or

1.

liabilities, exceed the sum of three hundred thousand dollars ($300,000), except in case of war to repel invasion or suppress insurrection, unless the same shall be authorized by law for some single object or work to be distinctly specified therein which law shall provide ways and means, exclusive of loans, for the payment of the interest of such debt or liability as it falls due, and also to pay and discharge the principal of such debt or liability within 50 years of the time of the contracting thereof, and shall be irrepealable until the principal and interest thereon shall be paid and discharged, and such law may make provision for a sinking fund to pay the principal of such debt or liability to commence at a time after the incurring of such debt or liability of not more than a period of one-fourth of the time of maturity of such debt or liability; but no law shall take effect unless it has been passed by a two-thirds vote of all the members elected to each house of the Legislature and until, at a general election or at a direct primary, it shall have been submitted to the people and shall have received a majority of all the votes cast for and against it at such election; and all moneys raised by authority of such law shall be applied only to the specific object therein stated or to the payment of the debt thereby created.  Full publicity as to matters to be voted upon by the people is afforded by the setting out of the complete text of the proposed laws, together with the arguments for and against them, in the ballot pamphlet mailed to each elector preceding the election at which they are submitted, and the only requirement for publication of such law shall be that it be set out at length in ballot pamphlets which the Secretary of State shall cause to be printed. . . ." (Emphases added.)[1]

Statutes authorizing the issuance of bonds "have a special character, having been ratified by the voters under article XVI, section 1, of the State Constitution."  (*Veterans of Foreign Wars* v. *State of California*, *supra*, 36 Cal.App.3d 688, 696.)  The Constitution declares them to be "irrepealable until the principal and interest thereon shall be paid and discharged." The purpose of this constitutional provision was explained by the Court of Appeal in the *Veterans of Foreign Wars* case:

"The constitutional injunction against later repeal of the bond law aims to prevent the Legislature from making substantial changes in the scheme or design which induced voter approval."  (*Id.*, at p. 693.)

Thus we must determine whether the action taken by the Legislature regarding the disposition of the $10 million in bond funds for youth shelters makes a "substantial change" in the scheme or design of the bond act which induced voter approval.  First we will examine the bond act to determine the scheme or design for the use of the $10 million in bond funds for youth shelters.  Then we shall examine the action taken by the Legislature regarding disposition of the bond funds to determine whether it complies with that scheme.  The basic authorizing provision approved by the voters for youth shelter expenditures is Penal Code section 4496.12, subdivision (b).  It states:

"Moneys in the fund, up to a limit of twenty-five million dollars ($25,000,000), may be available for the purpose of making awards to public or private nonprofit agencies or joint ventures, or a combination of those entities, for purpose of purchasing equipment and for acquiring, renovating, or constructing

---

[1] Voter approval is also required for local bond issues under the conditions specified in section 18 of article XVI of the Constitution.

youth centers or youth shelters, <u>as may be provided by statute.</u>  Fifteen million dollars ($15,000,000) shall be available for youth centers and ten million dollars <u>($10,000,000) shall be available for youth shelters and shall be distributed by the Department of the Youth Authority.</u>  However, any remaining money that has not been awarded under this subdivision within two years of the effective date of this title shall be available for both youth centers and youth shelters."  (Emphasis added.)

Penal Code section 4496.19 in the bond act provides:

"Money in the fund [in which the proceeds of the sale of the bonds is deposited] may only be expended for projects specified in this chapter as allocated in appropriations made by the Legislature."

Thus the bond act provides that $25 million of the bond proceeds is to be used for "the purpose of purchasing equipment and for acquiring, renovating, or constructing youth centers or youth shelters, <u>as may be provided by statute.</u>"  This means that the specifics of the expenditure of the $25 million not spelled out in the bond act may be determined by the Legislature in the form of a statute.  The bond act provides that $10 million of the $25 million is to be be made available for youth shelters and that that $10 million "shall be distributed by the Department of the Youth Authority."  Finally the bond act provided that the bond proceeds could not be expended for any project without an allocation therefore in an appropriation made by the Legislature.  Thus the design or scheme of the bond act for the $10 million for youth shelters is that the distribution is to be made by the Youth Authority in the manner determined by the Legislature by statute with expenditures for any project subject to approriation by the Legislature.  The scheme of the bond act approved by the voters calls for participation by the Legislature not only in the budget process but also expressly provides that the Legislature may implement the scheme by a statute spelling out any particulars not covered in the bond act.  The bond act does not say which projects are to get the bond funds.  This is one of the particulars which the bond act leaves for determination by the Legislature "as may be provided by statute."

The Legislature acted to implement that part of the bond act providing $25 million for youth centers and youth shelters by the enactment of Chapter 1535, Statutes of 1988 adding sections 2010 through 2024 to the Welfare and Institutions Code.[2]  Under these statutory provisions, proposals for the expenditure of funds for youth centers and youth shelters are submitted to the Department of the Youth Authority ("Department") and must "[d]ocument the need for the applicant's proposal."  (§ 2017.)  The Department makes its selections based upon statutory criteria (§§ 2018-2020) and awards the funds when they are appropriated by the Legislature (§§ 2010-2011).[3] The awards criteria are based upon "demonstrated overcrowding

---

[2]  All references hereafter to the Welfare and Institutions Code are by section number only.

[3]  In *Clean Air Constituency* v. *California State Air Resources Bd.* (1974) 11 Cal.3d 801, 816-817, the court stated:

"An unconstitutional delegation of power occurs when the Legislature confers upon an administrative agency the unrestricted authority to make fundamental policy determinations.  [Citations.]  To avoid such delegation, the Legislature must provide an adequate yardstick for the guidance of the administrative body empowered to execute the law.  [Citations.]  Underlying these rules is the belief that the Legislature as the most representative organ of government should settle

problems" and "demonstrated need for additional youth shelter beds." (§ 2020, subd. (b)(1)(B).) The recipients of the awards are given various duties and responsibilities, and conditions are attached to the use of the funds. (§§ 2012-2015.) Of the $10 million available for youth shelters, at least $7 million may be awarded "to shelters for runaway youths" and at most $3 million for "shelters for abused and neglected children." (§ 2020, subd. (b)(1).) The maximum amount of a each grant is $1 million. (§ 2021.) The provision called into question by the request for this opinion is section 2020, subdivision (b)(1) which provides:

"Funding for youth shelters shall be awarded as follows:

(A) At least 70 percent to shelters for runaway youths.

(B) A maximum of 30 percent to shelters for abused and neglected children. Funds allocated for shelters for abused and neglected children shall be prioritized among no more than three counties of the 1st to 10th class, inclusive, as defined by Section 28020 of the Government Code. The criteria for selection of these counties shall be given to applicants in the following order of priority:

(i) Counties with existing youth shelters, as defined in subdivision (f) of Section 4496.04 of the Penal Code, with demonstrated overcrowding problems.

(ii) Counties which have a demonstrated need for additional youth shelter beds and which have initiated planning and the permit process for construction of a new shelter." (Emphasis added.)[4]

The effect of the statutory restriction to "counties of the 1st to 10th class" is to limit the number of counties eligible to receive bond funds for shelters for abused and neglected children to the 10 largest counties in the state, with the further restriction that no more than 3 of the eligible 10 counties may receive awards for youth shelters for abused and neglected children.[5] The question

---

insofar as possible controverted issues of policy and that it must determine crucial issues whenever it has the time, information and competence to deal with them. [Citation.]"

The criteria set forth in sections 2018-2020 meet the test for the delegation of authority by the Legislature to the Department. Of course, the Legislature also has the "last word" on the projects to be funded through the exercise of its budget appropriations power.

[4] Penal Code section 4496.04, subdivision (f) states:

"'Youth shelter' means a facility that provides a variety of services to homeless minors living on the street or abused and neglected children to assist them with their immediate survival needs and to help reunite them with their parents or, as a last alternative, to find a suitable home."

[5] Government Code section 28020 lists each of California's 58 counties by size of population, one per classification and largest first. The 10 largest counties are: Los Angeles, Orange, San Diego, Alameda, Santa Clara, San Francisco, San Bernardino, Sacramento, Contra Costa and San Mateo. The populations specified in the statute as "ascertained and determined" by the Legislature indicate that the 10 largest counties have 75 percent of the state's total population.

presented for resolution is whether this legislative restriction makes a substantial change in the scheme or design which induced voter approval of the bond act. We conclude that it does not.

The Legislature may classify counties by population and treat them differently due to their differing populations. (See *Board of Education* v. *Watson* (1966) 63 Cal.2d 829, 833-836 [statute applicable only to Los Angeles County ruled valid; "The Legislature . . . is free to recognize degrees of harm and to confine its regulation to those classes of cases in which the need is deemed to be most evident"]; *County of Madera* v. *Gendron* (1963) 59 Cal.2d 796, 800-801 [Legislature's classification of one county in each class based upon population upheld]; *Matter of Petition of Burke* (1911) 160 Cal. 300, 303 [the mere fact a class to which a statute applies consists of only one unit or entity does not render the enactment invalid]; *Great Lakes Properties, Inc.* v. *City of Rolling Hills Estates* (1964) 225 Cal.App.2d 525, 533-534 [legislation classifying governmental entities on the basis of population upheld where the size of the population bears a reasonable relation to the purposes of the statute].)

As we noted above the bond act did not designate the youth shelters which were to receive the bond proceeds. It directed that the bond proceeds were to be used for the purpose of youth shelters "as may be provided by statute". A statute which designated one or more youth shelters to receive the funds would have complied with that bond act provision. Instead of designating the projects the Legislature chose instead to establish criteria for the selection and had the Department make the selection using the statutory criteria. We believe the method of selecting the projects to receive the bond funds provided by the statute substantially complies with the scheme and design of the bond act. The Department distributes the funds as provided by statute (Pen. Code, § 4496.12, subd. (b)) and "as allocated in appropriations made by the Legislature" (Pen. Code, § 4496.19).

In summary the Legislature has been given broad authority under the bond act ratified by the voters to distribute bond funds for youth shelters. We believe that section 2020 is within the scope of the authority conferred. (See *Mills* v. *S.F. Bay Area Rapid Transit Dist.*, *supra*, 261 Cal.App.2d 666, 669 [use of proceeds of bond issue upheld; "the statutes, the notice of election and the ballot proposition itself contemplate a broad authority"]; *State School Bldg. Fin. Com.* v. *Betts*, *supra*, 216 Cal.App.2d 685, 692 ["voters authorized repayment . . . under conditions just as flexible as those necessarily implied in the phrase `as provided by law'"].)

In answer to the question presented, therefore, we conclude that the Legislature's limitation upon the number of counties eligible to receive funds for shelters for abused and neglected children complies with the conditions set forth in the bond act approved by the voters.

* * * * *